2015 COA 24M-2

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Michael Terrell CARTER, Defendant–Appellant.**

**Court of Appeals No. 12CA0857**

Colorado Court of Appeals, Div. I.

Announced March 12, 2015

As Modified on Denial of Rehearing August 13, 2015

As Amended May 18, 2017

---

482

Cynthia H. Coffman, Attorney General, Jay C. Fisher, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Mark Evans, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

## Opinion by JUDGE BOORAS

¶ 1 Defendant, Michael Terrell Carter, appeals the judgment of conviction entered upon jury verdicts finding him guilty of five counts of first degree burglary and three counts of misdemeanor child abuse. We remand the case to the trial court with directions to (1) vacate Carter's conviction and sentence for four counts of first degree burglary—assault/menace and (2) correct the mittimus accordingly. In all other respects, the judgment is affirmed.

### I.    Background

¶ 2 This case began with an incident at the home of R.W. on the evening of April 21, 2010, which allegedly involved Devone Fuller, Joshua Golston, and Carter. After Fuller, a former grade school classmate of R.W.,[1] knocked on the door, asking to use R.W.'s phone, two or three men rushed inside, pushing past R.W. One of the perpetrators was armed with a rifle, and had a black t-shirt covering his face and socks covering his hands.

¶ 3 While the perpetrators searched the house, several people called 911, and the police arrived moments later. Fuller and Golston fled as responding officers approached the front of the house, and they were later apprehended nearby. Wylie's wife, a friend who was residing in the basement, and at least three minor children had been in the house and witnessed the incident.

¶ 4 Carter was taken into custody several days later after his parole officer noted that his ankle monitor placed him within 150 to 200 feet of the R.W. residence on the night of the incident. Carter told the police that he was either at home or at work on the night of the incident. Carter's employer, however, denied that Carter was at work that evening. A sock and a t-shirt recovered from the crime scene later tested positive for Carter's DNA.

¶ 5 Carter was charged with four counts of first degree burglary—assault/menace, and one count of first degree burglary—deadly weapon, one count of aggravated battery, and three counts of misdemeanor child abuse. Carter was convicted on all charges except aggravated robbery. Golston was tried before Carter and was acquitted.

### II.    Challenge for Cause under Section 16–10–103(1)(k)

¶ 6 Carter argues that the trial court erred when it denied his challenge for cause, under section 16–10–103(1)(k), C.R.S. 2014, to prospective juror R.L. (Juror Three), a "criminal investigator" for the Colorado Public Utilities Commission (CPUC). The CPUC, he argues, qualifies as a "public law enforcement agency" under the statute. We disagree.

### A.    Applicable Facts

¶ 7 During voir dire, Juror Three stated that he was a "criminal investigator" for the

---

1. Carter alleges that he and R.W. were also previously acquainted, and were codefendants in a previous case, but this information was not presented to the jury.

CPUC, working primarily in the "transportation safety and compliance unit." He stated that he investigated both civil and criminal matters, but that most of his investigations were civil in nature. He also stated that he did not have arresting authority, did not file his own criminal cases, was not Peace Officer Standards and Training (POST) certified under sections 24–31–301 to –314, C.R.S. 2014, and did not carry a gun, but did carry a badge.

¶ 8 The defense claimed that Juror Three was statutorily disqualified to serve. The trial court ruled that Juror Three "does not meet the statutory definition of being an employee of a law enforcement agency." Carter used a peremptory challenge to remove Juror Three, and expended all other peremptory challenges.

### B. Standard of Review

¶ 9 When (1) a defendant challenges a juror for cause on the basis of a statutory relationship requiring automatic excusal for cause and (2) the statutory relationship is established, the trial court has no discretion in the matter and must sustain the challenge by removing the juror from further service on the case. *People v. Macrander*, 828 P.2d 234, 240 (Colo. 1992), *overruled on other grounds by People v. Novotny*, 2014 CO 18, 320 P.3d 1194. We review de novo the question of law of whether a prospective juror subjected to a challenge for cause was a compensated employee of a public law enforcement agency within the meaning of section 1610–103(1)(k) and Crim. P. 24(b)(1)(XII). *People v. Sommerfeld*, 214 P.3d 570, 572 (Colo. App. 2009).

### C. Law and Analysis

¶ 10 A criminal defendant has a constitutional right to a fair and impartial jury. *See Nailor v. People*, 200 Colo. 30, 32, 612 P.2d 79, 80 (1980); *People v. Hancock*, 220 P.3d 1015, 1016 (Colo. App. 2009). The right to challenge a prospective juror for cause is an integral part of this right. *See Carrillo v. People*, 974 P.2d 478, 486 (Colo. 1999); *People v. Chavez*, 313 P.3d 594, 596 (Colo. App. 2011).

¶ 11 A court must sustain a challenge for cause when "[t]he juror is a compensated employee of a public law enforcement agency or a public defender's office." § 16–10–103(1)(k); *see also* Crim. P. 24(b)(1)(XII) (containing similar language but not expressly requiring compensation). The Colorado courts have not yet addressed whether the CPUC qualifies as such an agency. We conclude that it does not.

¶ 12 Certain agencies have been recognized as "public law enforcement agencies," such as "any police department, sheriff's department, or district attorney's office; the office of the state attorney general; the Colorado bureau of investigations; and the Colorado state patrol." *People v. Speer*, 255 P.3d 1115, 1121 (Colo. 2011). In the context of the challenge for cause statute, "a law enforcement agency is a police-like division of government that has the authority to investigate crimes and to arrest, to prosecute, or to detain suspected criminals." *Ma v. People*, 121 P.3d 205, 211 (Colo. 2005).

¶ 13 Conversely, numerous cases have held that "agencies responsible for enforcing civil regulations are not law enforcement agencies for the purpose of section 16–10–103(1)(k)." *Id.* (citing *People v. Urrutia*, 893 P.2d 1338, 1346 (Colo. App. 1994) (Department of Defense); *People v. Zurenko*, 833 P.2d 794, 796 (Colo. App. 1991) (Department of Social Services and Equal Employment Opportunity Commission)). Moreover, "a prospective juror's governmental employer does not become a public law enforcement agency solely because the prospective juror in question, or any other of his co-employees for that matter, performs law enforcement functions." *Speer*, 255 P.3d at 1121 (citing *Ma*, 121 P.3d at 211; *People v. Simon*, 100 P.3d 487, 491 (Colo. App. 2004)).

¶ 14 The CPUC derives its authority from both constitutional and statutory origins. The Colorado Constitution vests the CPUC with "all power to regulate the facilities, service and rates and charges therefor, including facilities and service and rates and charges therefor ... of every corporation, individual, or association of individuals, wheresoever situate or operating within the State of Colorado ... as a public utility...."

Colo. Const. art. XXV. The Commission, therefore, has broad regulatory and legislative power over public utilities in the state.

¶ 15 The General Assembly also provided the CPUC the duty to enforce its regulations. *See* § 40-7-101, C.R.S. 2014 ("It is the duty of the commission to see that the constitution and statutes of this state affecting public utilities ... are enforced and obeyed and that violations thereof are promptly prosecuted and penalties due the state are recovered and collected...."). The CPUC has inherent authority to investigate alleged violations and issue orders requiring compliance with applicable laws and regulations. *Eveready Freight Serv., Inc. v. Pub. Utils. Comm'n*, 131 Colo. 172, 175-76, 280 P.2d 442, 444 (1955). It may levy "fines," "penalties," or "damages" for civil violations. *See, e.g.*, §§ 40-7-101, -102, -105, -107, -109, C.R.S. 2014.

¶ 16 Additionally, the CPUC statute creates seven criminal offenses, to be punished "as provided in" the criminal misdemeanor and felony statutes. *See* §§ 40-7-106, -108; 40-9-104; 40-10.1-113 to—114; 40-27-101, -113, C.R.S. 2014. The CPUC, however, does not have the authority to carry out its own prosecutions for violations of these criminal laws. Instead, that responsibility is specifically tasked to the local district attorney or the state attorney general. *See* §§ 40-7-101, -104; 40-10.1-116, C.R.S. 2014.

¶ 17 Carter argues that because all "members" of the CPUC are statutorily deemed "peace officers while engaged in ... [their] duties," the CPUC is a law enforcement agency. As peace officers, "members" have the authority to carry weapons while engaged in their duties, and have some authority to arrest. *See* §§ 16-2.5-101, -143; 16-3-102, C.R.S. 2014. However, we conclude that employees of an agency being classified by statute as "peace officers" while engaged in their duties is not determinative. *See Speer*, 255 P.3d at 1121 (citing *Ma*, 121 P.3d at 211; *Simon*, 100 P.3d at 491).

¶ 18 In *Simon*, a division of this court addressed whether the United States Environmental Protection Agency (EPA) qualified as a public law enforcement agency for purposes of section 16-10-103(1)(k). *Simon*, 100 P.3d at 490-91. The EPA maintained offices for both criminal investigations and civil enforcement. *Id.* (citing 42 U.S.C. § 4321 (2000)). It was also able to designate officers to investigate criminal violations, carry firearms, execute and serve warrants, and make arrests. *Id.* (citing 18 U.S.C. § 3063 (2000)).

¶ 19 The EPA's principal functions, however, consisted of developing, establishing, and enforcing environmental standards. *Id.* Therefore, because the EPA was "charged primarily with [the] regulation of civil matters," and only had "incidental penal enforcement authority," it was more properly characterized as an "investigatory and rule-making body," and was not a public law enforcement agency for the purposes of section 16-10-103(1)(k). *Id.* at 491.

¶ 20 We perceive the same to be true here. Although the CPUC has some authority to arrest and investigate a limited assortment of criminal violations, its primary functions involve the civil regulation of public utilities, services, and rates. *See* Colo. Const. art. XXV. It is therefore "charged primarily with [the] regulation of civil matters," only has "incidental penal enforcement authority," and, therefore, is not a public law enforcement agency for the purposes of section 16-10-103(1)(k). *See Simon*, 100 P.3d at 491. Because the CPUC is not a public law enforcement agency, we perceive no error in the trial court's denial of the challenge for cause to Juror Three.

### III. Restriction on Cross–Examination

¶ 21 Carter argues that the trial court erred by restricting him from eliciting, on cross-examination, information about two alleged incidents that he claims would have been relevant as to R.W.'s motive to testify and credibility. He further argues that these errors implicated his constitutional rights to confront witnesses and present relevant evidence for his defense. We disagree.

### A. Applicable Facts

¶ 22 In addition to arguing, as part of his defense, that he was not present at the R.W. home, Carter argued, in the alternative, that

what happened was not a "straightforward home invasion." He argued that, instead of a home invasion, it might have been a "drug deal gone wrong," in which R.W. possessed drugs in his home and participated in the event. This had been, essentially, Golston's defense during his trial.

¶ 23 Carter presented evidence and argument to support this alternate defense, including testimony (1) from R.W. that he was on parole at the time of the incident and was subject to sanctions for violations such as interacting with other parolees or possessing drugs or firearms; (2) from R.W. that he wiped off his fingerprints after holding the rifle purportedly carried by one of the perpetrators; and (3)indicating that Fuller and Golston were carrying large quantities of drugs and cash, respectively, when they were apprehended near R.W.'s home.

¶ 24 Carter sought to cross-examine R.W. about an incident that allegedly had occurred outside of the courthouse after the first day of testimony in Golston's trial, in which R.W. threatened Golston with a gun to "take the deal." He argued that the incident was probative of R.W.'s motive and credibility, and was relevant for impeachment purposes. The trial court ruled that the alleged incident was irrelevant and therefore inadmissible. Defense counsel protested that exclusion of the evidence would implicate Carter's rights to confrontation, cross-examination, due process, a fair trial, effective assistance of counsel, and his right to present a complete defense.

¶ 25 Carter also sought to cross-examine Detective Meier, an investigating detective on the case, about allegedly attempting to obtain consent to search R.W.'s cell phone. Trying to gain R.W.'s consent, Detective Meier purportedly relayed that the purpose of doing so was to determine whether R.W. had been in contact with the perpetrators prior to the incident, as alleged by Golston. That information, Carter asserts, was relevant as to "the effect on the listener" and R.W.'s credibility, because, as Detective Meier and R.W. later testified, R.W. initially refused consent and later provided a faulty access code.

¶ 26 On redirect examination, Detective Meier indicated that he had spoken with R.W. and had given him some indication of Golston's intended defense. On recross-examination, Carter's counsel attempted to elicit information about what Detective Meier had told R.W. during that conversation. The prosecution objected to the question as irrelevant, hearsay, and inadmissible under CRE 403, and the trial court sustained the objection. Carter did not assert a Confrontation Clause violation at this point.

B. Preservation and Standard of Review

¶ 27 "Trial courts are accorded considerable discretion in deciding questions concerning the admissibility of evidence[,] and they have broad discretion to determine the relevancy of evidence." *People v. Ibarra*, 849 P.2d 33, 38 (Colo. 1993). A court abuses its discretion when its evidentiary decision is manifestly arbitrary, unreasonable, or unfair. *People v. Rath*, 44 P.3d 1033, 1043 (Colo. 2002).

¶ 28 If an erroneous evidentiary ruling implicates a defendant's constitutional rights, such as creating a Confrontation Clause violation, it is considered under a constitutional harmless error standard. *People v. Fry*, 92 P.3d 970, 980 (Colo. 2004); *People v. Phillips*, 2012 COA 176, ¶ 93, 315 P.3d 136. We review de novo a defendant's contention that the trial court violated his Confrontation Clause rights. *Phillips*, ¶ 85, (citing *Bernal v. People*, 44 P.3d 184, 198 (Colo. 2002)).

¶ 29 Carter preserved this issue as to the cross-examination of R.W. It is not clear whether it was preserved as to the recross-examination of Detective Meier; however, because we find no abuse of discretion, we need not decide whether the plain error standard applies.

C. Law and Analysis

¶ 30 The Confrontation Clause of the United States Constitution guarantees the right of a criminal defendant to cross-examine witnesses testifying for the prosecution. U.S. Const. amend. VI; Colo. Const. art. II, § 16; *Vega v. People*, 893 P.2d 107, 118

(Colo. 1995). " '[I]t is constitutional error to limit excessively a defendant's cross-examination of a witness regarding the witness'[s] credibility, especially cross-examination concerning the witness'[s] bias, prejudice, or motive for testifying.' " *Id.* (quoting *Merritt v. People*, 842 P.2d 162, 167 (Colo. 1992)).

¶ 31 Confrontation Clause analysis focuses on the individual witness rather than the outcome of the entire trial. *Kinney v. People*, 187 P.3d 548, 561 (Colo. 2008). Accordingly, an error is prejudicial when the desired cross examination would have left a reasonable jury with "a significantly different impression" of the witness's credibility. *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

¶ 32 "An erroneous evidentiary ruling may [also] rise to the level of constitutional error if it deprived the defendant of any meaningful opportunity to present a complete defense." *People v. Conyac*, 2014 COA 8M, ¶ 93, 361 P.3d 1005 (citing *People v. Osorio–Bahena*, 2013 COA 55, ¶ 17, 312 P.3d 247). That right is violated "only where the defendant was denied virtually his only means of effectively testing significant prosecution evidence." *Id.* (citing *Krutsinger v. People*, 219 P.3d 1054, 1062 (Colo. 2009)).

¶ 33 "[A] trial court has wide latitude, insofar as the Confrontation Clause is concerned, to place reasonable limits on cross-examination based on concerns about, for example, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation which is repetitive or only marginally relevant." *Merritt*, 842 P.2d at 166 (citing *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. 1431). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. "Evidence which is not relevant is not admissible." CRE 402. Even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." CRE 403.

¶ 34 Because there is no right to present irrelevant evidence, Carter's claims here must fail. Carter asserts that the evidence he intended to elicit on cross-examination of R.W. and recross-examination of Detective Meier tended to support a defense that what happened at R.W.'s house on the eve of the incident was not a robbery, but a botched drug deal. However, the threat that R.W. purportedly made to Golston to "take the deal" did not directly implicate R.W. in any drug dealing.

¶ 35 Similarly, R.W.'s reluctance to provide his cell phone code to Detective Meier would not have provided a basis to infer that he was trying to conceal his drug dealing without an additional inference that the phone contained evidence of such activities. Any inference that the threat to Golston or the cell phone incident related to drug-dealing would have been too speculative to support their relevance. *See, e.g., People v. Knight*, 167 P.3d 147, 152–53 (Colo. App. 2006); *People v. Franklin*, 782 P.2d 1202, 1206 (Colo. App. 1989) (statements properly excluded where relevant inference follows only after a number of speculative assumptions).

¶ 36 Additionally, although the incidents might be characterized as "misconduct," they had little, if any, bearing on R.W.'s bias, motives, or credibility as a witness. *Knight*, 167 P.3d at 153. Under CRE 608(b), a witness may be cross-examined about specific instances of conduct that bear on the witness's character for untruthfulness, but a trial court should exclude evidence that has little such bearing, or that "places undue emphasis on collateral matters, or has the potential to confuse the jury." *Id.* (citing CRE 403; *People v. Pratt*, 759 P.2d 676, 681 (Colo. 1988); *People v. Cole*, 654 P.2d 830, 833 (Colo. 1982)).

¶ 37 Therefore, these inquiries were properly excluded. *See People v. Walker*, 666 P.2d 113 (Colo. 1983) (Although cross-examination which focuses on motive is liberally permitted, court's restriction properly "prevented the sideshow from taking over the circus."). Having concluded that the trial court acted within its discretion to limit questioning on these matters, we discern no violation of Carter's constitutional right to

confront adverse witnesses or present a complete defense. *See People v. Hogan*, 114 P.3d 42, 55 (Colo. App. 2004) (upholding limitation on cross-examination on CRE 403 grounds as consistent with confrontation rights).

## IV. Complicity Instructions

¶ 38 Carter argues that the trial court erred when it gave an additional instruction on complicity liability. We disagree.

### A. Standard of Review

¶ 39 "We review jury instructions de novo to determine whether they accurately inform the jury of the governing law. We review the trial court's decision to give a particular jury instruction for abuse of discretion." *People v. Oram*, 217 P.3d 883, 893 (Colo. App. 2009), *aff'd*, 255 P.3d 1032 (Colo. 2011). "The trial court has broad discretion to formulate jury instructions as long as they are correct statements of the law." *Id.*

### B. Applicable Facts

¶ 40 The trial court gave two jury instructions on complicity liability. Jury instruction 22 tracked exactly the model general complicity instruction, while jury instruction 23 addressed the timing of the requisite mental states. *See Bogdanov v. People*, 941 P.2d 247, 254 n. 10, *amended by* 955 P.2d 997 (Colo. 1997), *disapproved of by Griego v. People*, 19 P.3d 1 (Colo. 2001); COLJI–Crim G1:06 (2008).[2] Jury instruction 23, taken from *People v. Alvarado*, 284 P.3d 99, 102, 103 (Colo. App. 2011), contained the approved supplemental instruction given in that case, and a paraphrased portion of the court's analysis. Instruction 23 stated:

> There is no requirement that a complicitor have advance knowledge of the principal's intent to commit a crime. Contemporaneous knowledge by the complicitor of the principal's intent is sufficient. The defendant must have had knowledge of the other person's intent to commit all or part of the crime either before or at the time the

other person committed all or part of the crime.

Carter objected to instruction 23 on the basis that it placed undue emphasis on the knowledge component of liability.

¶ 41 During deliberations, the jury asked the trial court if, "by answering yes to instructions [22] and [23]," they were "compelled to say guilty to all charges or [if] each charge [should] be looked at individually." The judge responded that the jury should use those instructions, in conjunction with instruction 12, which stated, in part, that "each count charges a separate and distinct offense and the evidence and the law applicable to each count should be considered separately, uninfluenced by your decision as to any other count."

### C. Law and Analysis

¶ 42 Carter argues that, by not stating what contemporaneous knowledge was sufficient for, instruction 23 implied that it was sufficient for the state to prove only that Carter knew that one of the principals intended to commit a crime, and thereby contradicted instruction 22. By creating this implication, Carter argues that the instruction unconstitutionally lowered the prosecution's burden of proof.

¶ 43 Carter's arguments closely mirror those made in *Evans v. People*, 706 P.2d 795, 798 (Colo. 1985). In that case, the contested instruction contained a paragraph taken from the pattern entrapment instruction followed by a paragraph taken roughly from the analysis in *Bailey v. People*, 630 P.2d 1062 (Colo. 1981). *Evans*, 706 P.2d at 797–98. The *Evans* court noted that using excerpts from an opinion in an instruction "is generally an unwise practice." *Id.* at 800.

¶ 44 The court explained that opinions and instructions have very different purposes because " '[l]anguage used in an opinion [is] pertinent to the issues and . . . facts in that case[, and] may be a proper expression of the law as related to those facts . . . yet may not be sufficien[t] . . . to serve as a satisfactory . . . instruction to a jury.' " *Id.* (quoting

---

2. The trial court used the pattern instructions that were in effect at the time of trial. However, they have since been updated. COLJI–Crim. G1:06 (2014).

*Cohen v. People*, 106 Colo. 245, 247, 103 P.2d 479, 480 (1940)). Ultimately, the court held that the latter paragraph "swept aside" the requirements of the entrapment statute by contradicting part of the first paragraph and not accurately summarizing the holding in *Bailey*. *Id.* at 799–800. We do not perceive the same to be true here.

¶ 45 Standing alone, instruction 23 might be confusing, but, unlike in *Evans*, it didn't "conflic[t] with" or "contradic[t]" instruction 22. *Id.* at 799, 800. Instead, when read together, instruction 23 expanded upon instruction 22, and when read as a whole, the instructions accurately informed the jury of the applicable law. § 18-1-603, C.R.S. 2014; *see People v. Wheeler*, 772 P.2d 101, 104 (Colo. 1989); *Evans*, 706 P.2d at 797-98, 799–800; *Alvarado*, 284 P.3d at 103.

¶ 46 The jurors were instructed that the instructions must be read together, as a whole. *People v. Vanrees*, 125 P.3d 403, 410 (Colo. 2005). They were also instructed that the prosecution must prove, "beyond a reasonable doubt[,] the existence of all the elements to constitute the crime charged." We therefore see no error here.

¶ 47 Carter, however, argues that the jurors nevertheless incorrectly understood instruction 23, relying on the jury's question during deliberations. However, we do not see how the question demonstrates misunderstanding as to the knowledge requirement. We perceive the question to relate only to the multiple counts, containing separate offenses, with which Carter was charged.

¶ 48 Carter also argues that the prosecution's statement in closing argument, "[i]f one holds a gun, they are all responsible for it," exacerbated the instructional error. However, "it is not improper for an attorney in closing argument to focus on one element of an offense or defense without addressing the other elements as long as the attorney does not suggest that those other elements are irrelevant." *People v. Castillo*, 2014 COA 140M, ¶ 67, —— P.3d ——. In light of the trial court's having informed the jury that "each and every element" had to be proved beyond a reasonable doubt before it could convict, we presume that, notwith-

standing the prosecutor's comment, the jury heeded the court's instructions. *See People v. Phillips*, 91 P.3d 476, 484 (Colo. App. 2004).

¶ 49 Carter finally argues that it was inappropriate for instruction 23 to be included because, unlike in *Alvarado*, the jurors never asked a question to indicate that they were confused about the temporal aspect of the knowledge element. *Alvarado*, 284 P.3d at 102. However, simply because the court gave the instruction without juror inquiry does not make it improper. Although the "use of an excerpt from an opinion in an instruction is generally an unwise practice," the trial court has broad discretion over the formulation of jury instructions, so long as they are correct statements of the law. *Evans*, 706 P.2d at 800. Thus, we see no abuse of discretion in the court's decision to include instruction 23. *See Oram*, 217 P.3d at 893.

## V. Puzzle Analogy

¶ 50 Carter argues that the trial court erred during voir dire instructions to the jury by analogizing the beyond a reasonable doubt standard to an incomplete jigsaw puzzle, and by allowing the prosecutor to make similar comments, consequently lowering the prosecution's burden of proof. He further argues that these errors implicated his constitutional right to a fair trial. We perceive no plain error.

### A. Standard of Review

¶ 51 Carter did not object to these statements, and thus did not preserve this issue for appellate review. Consequently, reversal is not warranted in the absence of plain error. *See People v. Miller*, 113 P.3d 743, 749-50 (Colo. 2005). Plain error is error that is obvious, and that so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Id.* at 750.

¶ 52 As applied to jury instructions, a defendant must "'demonstrate not only that the instruction affected a substantial right, but also that the record reveals a reasonable possibility that the error contributed to his conviction.'" *Id.* (quoting *People*

*v. Garcia*, 28 P.3d 340, 344 (Colo. 2001)). A court's improper instruction "does not constitute plain error if the relevant instruction, read in conjunction with other instructions, adequately informs the jury of the law." *Id.* (citing *People v. Harlan*, 8 P.3d 448, 472 (Colo. 2000)).

¶ 53 Prosecutorial misconduct rarely constitutes plain error. *People v. Estes*, 2012 COA 41, ¶ 19, 296 P.3d 189. To warrant reversal under the plain error standard, prosecutorial misconduct must be " 'flagrantly, glaringly, or tremendously improper.' " *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo. 2005) (quoting *People v. Avila*, 944 P.2d 673, 676 (Colo. App. 1997)).

### B. Applicable Facts

¶ 54 In its opening comments to the prospective jurors during voir dire, the trial court gave the following instruction on the beyond a reasonable doubt standard:

Proof beyond a reasonable doubt, a reasonable doubt is a doubt based upon reason and common sense which arises from a fair and rational consideration of all the evidence or lack of evidence in the case. It is a doubt which is not a vague, speculative, or imaginary doubt but such a doubt as would cause reasonable people to hesitate to act in matters of importance to themselves. Now, ladies and gentlemen, that's the standard. That's the standard. What I'm going to suggest to you is a word picture, that if we sent [twelve] of you back with a giant zigsaw [sic] puzzle and each of the pieces to that puzzle represented some evidence of, that the People had presented to you in this case, and when you get to the bottom of the box you find that, by golly, you didn't get all the pieces.

And there may be a picture of a white building with a part of a red roof and the rest of the roof structure is not there. There might be a fence that part of a fence that goes around but then part of that's missing; and then there might be about half of, what looks like to be a house over there also.

Now, I suspect that if [twelve] of you sat down and looked that over, you might be able to figure out that there's a barn and a

corral and a house there, even if you can't see it all, that might be enough proof beyond a reasonable doubt, based upon your interpretation of what it is you see and what you don't.

It's not proof beyond all doubt. If it were beyond all doubt, you would have all the pieces, proof beyond a reasonable doubt.

¶ 55 When asking a prospective juror about the standard, the prosecutor said:

And here's the thing, after a case is over, there have been times I talked to jurors and they said, Well, you know, you did 'a fine job and you know, I believe he did the crime. but here's something that, you know, I was wanting.

The problem with that is, if they believe he did the crime, I'm done. That's it. You know, there might be things that are unsettled. There might be things that are outstanding. There might be puzzle pieces missing from the overall puzzle. But if you believe the defendant committed the crime, that's the end of the analysis.

¶ 56 The prosecutor, during rebuttal closing, at the conclusion of oral arguments, revisited the puzzle analogy:

When [defense counsel] talked about this case, you notice that she split everything up individually. But you know from your instructions even the judge told you during jury selection that you consider everything together. It's a puzzle. The evidence, well, you know from the charges that if he's there and involved, he's guilty. But the evidence tells you the role that he played here. First, you have the connection with [Fuller] including a text message from [Fuller's girlfriend] afterwards. Then we have a change in alibi in an attempt to fit the evidence. That's another piece of the puzzle.... There's one conclusion if you put together the pieces of this puzzle, Michael Carter's guilty.

Carter made no objections to the court's instructions during voir dire or to any of the prosecutor's statements. After trial and before deliberations, the jury received the full pattern instruction for presumption of innocence and the prosecution's burden of proof

beyond a reasonable doubt, verbally and in writing. COLJI–Crim. E:03 (2008).[3]

### C. Law and Analysis

¶ 57 There is no Colorado case law addressing a trial court's use of a puzzle analogy to explain the concept of reasonable doubt, but Carter notes that numerous jurisdictions have found such analogies problematic. *See, e.g., People v. Johnson,* 119 Cal. App.4th 976, 14 Cal.Rptr.3d 780, 785–86 (2004) (reversible error where, equating reasonable doubt standard to everyday decision-making, court expounded at length during voir dire and in response to prospective juror questions, and prosecutor made similar statements in argument); *State v. Crawford,* 46 Kan.App.2d 401, 262 P.3d 1070, 1081 (2011) (prosecutor committed misconduct, but there was no reversible error, when, during voir dire and closing argument, he used a puzzle analogy to explain reasonable doubt standard); *People v. Wilds,* 141 A.D.2d 395, 529 N.Y.S.2d 325, 327 (1988) (court's reasonable doubt puzzle analogy in jury instruction during trial "diminished the People's burden of proof," requiring reversal).

¶ 58 Given the case law from other jurisdictions, we will assume, without deciding, that the trial court improperly analogized the concept of reasonable doubt to a puzzle. However, we are not persuaded that the error is obvious and so clear-cut that a trial judge should have been expected to avoid it without benefit of an objection. *See People v. O'Connell,* 134 P.3d 460, 464 (Colo. App. 2005) (citing *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Nor can we conclude that the trial court's analogy and the prosecutor's comments so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction.

¶ 59 The trial court verbally instructed the jury twice on the definition of reasonable doubt, as stated in the model jury instructions and applicable case law, and also provided final written instructions. *See* COLJI–Crim. E:03 (2008); *People v. Robles,* 302 P.3d

269, 280–81 (Colo. App. 2011). Absent evidence to suggest otherwise, we presume that the jury followed these instructions. *See Phillips,* 91 P.3d at 484; *People v. Sherman,* 45 P.3d 774, 777 (Colo. App. 2001) (not reversible error where court erroneously elaborated on reasonable doubt standard after prospective juror question during voir dire, but court also provided correct instruction).

¶ 60 Further, the prosecutor's use of the puzzle analogy was relatively brief and isolated. *See Estes,* ¶ 41; *People v. Munsey,* 232 P.3d 113, 124 (Colo. App. 2009) (unlikely that contested statements substantially influenced verdict where contained in isolated portion of closing and no other allegations of prosecutorial misconduct during closing were made); *cf. Harris v. People,* 888 P.2d 259, 268 (Colo. 1995) (reversal required where improper comments repeated over the course of the entire closing argument).

¶ 61 Therefore, even assuming the statements made by the court and prosecutor were improper, we discern no plain error. *See Estes,* ¶¶ 6, 12, 40, 45 (not plain error where trial court stated during voir dire that defendant "did something" to stand trial and prosecutor provided improper explanation of presumption of innocence standard because jury was given correct instructions during voir dire and at close of evidence); *People v. Cevallos–Acosta,* 140 P.3d 116, 123 (Colo. App. 2005) (prosecutor's improper definition of deliberation during voir dire and closing arguments was not plain error where jury instructions correctly defined the concept).

### VI. "Magic Tricks" and "Red Herrings"

¶ 62 Carter argues that the trial court erred when it allowed the prosecutor to make statements characterizing defense counsel as attempting to distract the jury with "magic trick[s]" and "red herrings." He further argues that, together, the comments implied that defense counsel's representation was not based upon a good faith belief in Carter's innocence, and that this error implicated his constitutional right to a fair trial. We disagree.

---

**3.** The trial court used the pattern instructions that were in effect at the time of trial. They have since·been updated, but the language remains substantially the same. COLJI–Crim. E:03 (2014).

### A. Standard of Review

¶ 63 In reviewing prosecutorial misconduct claims, we first consider whether the prosecutor's arguments were improper. *See Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). "Whether a prosecutor's statements constitute misconduct is generally a matter left to the trial court's discretion." *Domingo–Gomez*, 125 P.3d at 1049. We consider "the context of the argument as a whole and in light of the evidence before the jury." *People v. Samson*, 2012 COA 167, ¶ 30, 302 P.3d 311. We will not disturb the trial court's rulings regarding such statements absent a showing of abuse of discretion. *People v. Strock*, 252 P.3d 1148, 1152 (Colo. App. 2010). Second, we review the "combined prejudicial impact" of any improper statements to determine whether they require reversal under the applicable standard. *Domingo–Gomez*, 125 P.3d at 1053; see also *Wend*, 235 P.3d at 1098 ("We focus on the cumulative effect of the prosecutor's statements . . . .").

¶ 64 For the reasons set forth in *Crider v. People*, 186 P.3d 39, 42– 43 (Colo. 2008), we reject Carter's contention that we must review the alleged prosecutorial·misconduct for constitutional harmless error. *See id.* at 42 ("[E]xceeding less well-defined ethical boundaries by threatening to mislead a jury with expressions of personal opinion or inflammatory comments is broadly accepted as being subject to the discretion of the trial court, which does not rise to the level of constitutional error."). Instead, we review it for non-constitutional harmless error. *See People v. Davis*, 280 P.3d 51, 52 (Colo. App. 2011). Under a harmless error standard, reversal is required unless "there is no reasonable probability that [the court's erroneous ruling] contributed to the defendant's conviction." *Crider*, 186 P.3d at 42.

### B. Applicable Facts

¶ 65 During voir dire, the prosecution made the following comments to prospective jurors:

> I've worked with . . . the defense counsel on this case. They're going to be zealously defending their client and advocate for their side. But I don't want you all to lose focus. I don't want you all—and think of it like a magic trick. When a magician does a trick, usually by sleight of hand, they say, look over here, look over here. Don't look over here, look over here, look over here, because I don't want you to see what I'm trying to do.

¶ 66 Carter objected to the comment as argumentative, but the objection was overruled. The prosecution then stated that, while working with one of Carter's counsel, he had seen her "become very emotional to the point where she's in tears," and asked several prospective jurors if "that emotion" would affect them. No objection was made to these comments.

¶ 67 During rebuttal closing, the prosecutor said "[i]t's clear that both sides were accusing the other of trying to distract you with stuff. And I submit to you that there are red herrings that they've thrown out there, hoping you'll follow them." Carter objected that the prosecutor was making "inappropriate commentary on defense counsel's argument." The trial court responded only by instructing the jurors that arguments of counsel are not evidence. The prosecutor continued: "They want you to look anywhere but here at this evidence and using your common sense and there because if you look at both, there's only one conclusion; and that's that he's guilty."

¶ 68 Carter also notes that the prosecution, in rebuttal closing, repeatedly focused on defense counsel by making statements like "[defense counsel] says they're not asking you to speculate" and "[defense counsel] wants you to ignore the DNA evidence, just ignore it." Carter, however, made no objections to any of these statements.

### C. Law

¶ 69 " '[A] prosecutor, while free to strike hard blows, is not at liberty to strike foul ones.' " *Domingo–Gomez*, 125 P.3d at 1048 (quoting *Wilson v. People*, 743 P.2d 415, 418 (Colo. 1987)). Consequently, a prosecutor may use every legitimate means to bring about a just conviction, but he or she has a duty to avoid using improper methods designed to obtain an unjust result. *Id.*

¶ 70 A prosecutor may ordinarily "'employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance.'" *People v. Collins*, 250 P.3d 668, 678 (Colo. App. 2010) (quoting *People v. Allee*, 77 P.3d 831, 837 (Colo. App. 2003)). A prosecutor may not, however, use arguments calculated to inflame the passions and prejudices of the jury, mislead the jury, denigrate defense counsel, or imply that the defense is not being asserted in good faith. *See Davis*, 280 P.3d at 52; *People v. Gladney*, 250 P.3d 762, 769 (Colo. App. 2010); *People v. Bowles*, 226 P.3d 1125, 1132 (Colo. App. 2009); *People v. Jones*, 832 P.2d 1036, 1038 (Colo. App. 1991).

¶ 71 We evaluate a claim of prosecutorial misconduct by looking at the "context of the argument as a whole and in light of the evidence before the jury." *People v. Geisendorfer*, 991 P.2d 308, 312 (Colo. App. 1999). In the context of voir dire, a prosecutor commits misconduct when he or she misstates the law, presents factual matter he or she knows will be inadmissible, or argues the prosecution's case to the jury. *People v. Krueger*, 2012 COA 80, ¶ 50, 296 P.3d 294. "During closing argument, a prosecutor has wide latitude and may refer to the strength and significance of the evidence, conflicting evidence, and reasonable inferences that may be drawn from the evidence." *People v. Walters*, 148 P.3d 331, 334 (Colo. App. 2006). However, the prosecutor must "stay within the limits of appropriate prosecutorial advocacy during closing argument." *Id.* "A prosecutor is [also] afforded considerable latitude in replying to an argument by defense counsel." *People v. Wallace*, 97 P.3d 262, 269 (Colo. App. 2004).

## D.  Analysis

¶ 72 The comments made during rebuttal closing, in light of the rest of the arguments, appear to have been made "in the context of attempting to draw the jury's focus to relevant evidence and w[ere] not intended to denigrate opposing counsel." *Allee*, 77 P.3d at 836 (asking jury not to be confused by defense tactic not improper where intended to draw jury's focus to relevant evidence, rather than to denigrate defense counsel); *see People v. Ramirez*, 997 P.2d 1200, 1211 (Colo. App. 1999) (prosecutor's statements characterizing defense argument as "blowing smoke" was proper when used not as a comment on defense counsel's belief in the merits of her case, but instead to show that evidence lacked substance); *People v. Serpa*, 992 P.2d 682, 686 (Colo. App. 1999) (remarks suggesting that evidence presented by defense was designed as a "diversion" and to "sidetrack" the jury from the central issue of the case not improper when made "in reference to specific evidence" presented); *cf. Jones*, 832 P.2d at 1039 (repeated remarks regarding defense counsel, her preparation, and her lack of good faith belief in her client's defense which "served no legitimate purpose" other than to denigrate defense counsel were improper). "Although the reference to defense counsel was arguably inappropriate, as a whole, the prosecutor's statements were fair comment on the evidence...." *People v. Roadcap*, 78 P.3d 1108, 1114 (Colo. App. 2003) (citation omitted). Therefore, we do not perceive them to be improper.[4]

¶ 73 Conversely, because the prosecutor's comments during voir dire did not appear to be tied, in any way, to the evidence, they were improper. *Cf. id.*; *Allee*, 77 P.3d at 836. Nevertheless, we conclude that the prosecutor's statements during voir dire were harmless. These statements were a very brief part, and not the focus, of the overall voir dire and argument. *People v. McBride*, 228 P.3d 216, 225 (Colo. App. 2009). During closing argument, the court instructed the jurors that attorney arguments were not evidence. *See Castillo*, ¶ 76. Moreover, Carter did not object to many of the comments—both during voir dire and during closing—of which he now complains. *See*

---

4. To the extent that the prosecution argues that the invited error doctrine applies here due to allegedly similar comments made by the defense during closing argument, we disagree. The invited error doctrine "applies where one party expressly acquiesces to conduct by the court or the opposing party." *Horton v. Suthers*, 43 P.3d 611, 619 (Colo. 2002). The prosecution cites to no authority, and we are aware of none, where denigrating comments from one side properly invited denigrating comments from the other. *See*

*People v. Rodriguez,* 794 P.2d 965, 972 (Colo. 1990) (The " 'lack of an objection may demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging.'" (quoting *Brooks v. Kemp,* 762 F.2d 1383, 1397 n. 19 (11th Cir. 1985))). Because any prosecutorial misconduct here was harmless, we perceive no need for reversal.

## VII. Double Jeopardy

■ ¶ 74 Carter was convicted of and sentenced for five counts of first degree burglary, with four counts of first degree burglary—assault/menace and one count of first degree burglary—deadly weapon. On appeal, he argues that the trial court erred in entering convictions on each count of first degree burglary. We agree.

### A. Standard of Review and Law

¶ 75 Because the double jeopardy challenge was not raised in the trial court, we apply a plain error standard of review.[5] *See People v. Fuentes,* 258 P.3d 320, 322 (Colo. App. 2011); *People v. Olson,* 921 P.2d 51, 53 (Colo. App. 1996). To constitute plain error, the error must so undermine the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Fuentes,* 258 P.3d at 322–23; *Olson,* 921 P.2d at 53. The Double Jeopardy Clauses of the United States and Colorado Constitutions prohibit punishing a defendant multiple times for the same offense. *See* U.S. Const. amend. V; Colo. Const. art. II, § 18; *Woellhaf v. People,* 105 P.3d 209, 214 (Colo. 2005).

### B. Application

¶ 76 Carter's burglary convictions were based on the same unlawful entry of the victims' home. We adopt the reasoning of the *Fuentes* division, which held that "a single entry can support only one conviction of first degree burglary, even if multiple assaults occur...." 258 P.3d at 325. Therefore, Carter's five first degree burglary convictions violate the Double Jeopardy Clause.

¶ 77 We reject the People's arguments that (1) multiple burglary convictions can be supported by Carter's acts of menacing separate victims during a single unlawful entry and (2) Carter's first degree burglary—deadly weapon count was a distinct offense, requiring proof of different elements. Permitting multiple convictions on these bases would ignore the law that a single entry can support only one first degree burglary conviction. *See id.*

■ ¶ 78 Moreover, while "the General Assembly may proscribe alternative means of committing the same offense," a court may not "impos[e] multiple punishments for each prohibited method a defendant uses" if he uses "more than one of the proscribed methods ... to accomplish the offense." *Woellhaf,* 105 P.3d at 218. In deciding which first degree burglary conviction to retain, we must fully effectuate the jury's verdict by entering as many convictions and imposing as long a sentence as legally possible. *See People v. Delci,* 109 P.3d 1035, 1038 (Colo. App. 2004) ("[W]hen multiple convictions are given and one must be vacated, the trial court should select as many convictions and impose the longest sentences that are legally possible fully to effectuate the jury's verdict." (citing *People v. Glover,* 893 P.2d 1311, 1314 (Colo. 1995))).

¶ 79 To maximize the jury's verdict, we affirm the conviction for first degree burglary—deadly weapon because it is a crime of violence under section 18–1.3–406, C.R.S. 2014, and remand the case to the trial court to vacate Carter's first degree burglary—assault/menace convictions and sentence.

5. "[D]ivisions of this court are split as to whether unpreserved double jeopardy claims may be reviewed on appeal." *People v. Friend,* 2014 COA 123M, ¶ 48, —— P.3d ——. The supreme court has granted certiorari on this issue in several cases. *See People v. Zubiate,* 2013 COA 69, ¶ 38, —— P.3d —— (*cert. granted* June 16, 2014); *People v. Smoots,* 2013 COA 152, 396 P.3d 53 (*cert. granted* June 30, 2014); *People v. Hill,* 2013 WL 4047498 (Colo.App. No. 12CA0168, Aug. 8, 2013) (not published pursuant to C.A.R. 35(f)) (*cert. granted* June 30, 2014); *People v. Reyna–Abarca,* 2013 WL 4008874 (Colo.App. No. 10CA0637, Aug. 1, 2013) (not published pursuant to C.A.R. 35(f)) (*cert. granted* June 30, 2014); *People v. Bunce,* 2013 WL 3974719 (Colo.App. No. 12CA0622, July 25, 2013) (not published pursuant to C.A.R. 35(f)) (*cert. granted* June 16, 2014). We agree that unpreserved double jeopardy issues may be reviewed on appeal.

*See Glover,* 893 P.2d at 1315; *People v. Moore,* 321 P.3d 510, 517 (Colo. App. 2010), *vacated in part on other grounds,* 2014 CO 8, 318 P.3d 511.

### VIII. Cumulative Error

¶ 80 Finally, Carter contends that the cumulative effect of the errors in this case, even if individually harmless, deprived him of a fair trial and requires reversal. *People v. Clark,* 214 P.3d 531, 543 (Colo. App. 2009). "The doctrine of cumulative error requires that numerous errors be committed, not merely alleged." *People v. Rivers,* 727 P.2d 394, 401 (Colo. App. 1986) (citing *People v. Jones,* 665 P.2d 127 (Colo. App. 1982)). However, "[a] conviction will not be reversed if the cumulative effect of any errors did not substantially prejudice the defendant's right to a fair trial." *People v. Whitman,* 205 P.3d 371, 387 (Colo. App. 2007) (citing *People v. Roy,* 723 P.2d 1345, 1349 (Colo. 1986)).

¶ 81 Here, we have vacated four counts of first degree burglary—assault/menace based on improperly multiplicitous charges. We have rejected most of Carter's other allegations of error, and we conclude that any errors identified, alone or together, did not deprive Carter of a fair trial. *See Castillo,* ¶ 77; *People v. Gallegos,* 260 P.3d 15, 29 (Colo. App. 2010).

### IX. Conclusion

¶ 82 The case is remanded to the trial court with directions to (1) vacate Carter's conviction and sentence for four counts of first degree burglary—assault/menace and (2) correct the mittimus accordingly. In all other respects, the judgment is affirmed.

Taubman and Gabriel, JJ., concur.