19CA0549 Peo v Dalton 10-21-2021 COLORADO COURT OF APPEALS Court of Appeals No. 19CA0549 Adams County District Court No. 17CR579 Honorable Tomee Crespin, Judge Honorable Donald S. Quick, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Marlow Lee Dalton, Defendant-Appellant. JUDGMENT AFFIRMED IN PART, VACATED IN PART, AND CASE REMANDED WITH DIRECTIONS Division III Opinion by JUDGE LIPINSKY Furman and Brown, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced October 21, 2021 Philip J. Weiser, Attorney General, Paul E. Koehler, First Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Megan A. Ring, Colorado State Public Defender, Heather Wong, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant 
1 ¶ 1 Marlow Lee Dalton appeals his judgment of conviction for possession with intent to manufacture or distribute a controlled substance and possession of a controlled substance. We affirm his conviction for possession with intent to manufacture or distribute but vacate his conviction and sentence for possession. For this reason, we remand the case for resentencing on Dalton’s conviction for possession with intent to manufacture or distribute. I. Background ¶ 2 Deputies from the Adams County Sheriff’s Office responded to a report of a disturbance at Dalton’s residence. When the deputies arrived and announced themselves, Dalton responded from inside the residence that “he was tied up inside, that he had been in a shoot out inside of his home[,] and that . . . his legs were broken . . . .” In response to Dalton’s description of the situation, the officers said they would forcibly enter the residence to help him. Dalton agreed they could enter. Inside the residence, the deputies saw swords and bullets, which caused them concern that Dalton might be armed. ¶ 3 The deputies found Dalton hiding inside a closet. Dalton, who appeared to be uninjured, became verbally combative with the 
2 deputies. After he swung a crutch at one of them, the deputies subdued Dalton, handcuffed him, and patted him down for weapons. They did not find any weapons during the pat-down. (As noted below, Dalton contends that the search involved more than a pat-down, and that the deputies also pulled out his pockets.) The deputies did not arrest him. But, because they thought Dalton “was possibly hallucinating,” they took him to a hospital, where he was placed on a mental health hold. ¶ 4 Hospital staff asked Dalton to remove his clothing and put on a hospital gown. A hospital security officer placed Dalton’s clothing inside a bag, which the officer stored in a locker. The locker was located in an area near the nurse’s station where access was restricted to hospital staff. ¶ 5 The security officer later returned to the locker to search Dalton’s clothes to “[m]ake sure there [were] no weapons or [illicit] drugs or anything like that.” When he unrolled Dalton’s pants, the security officer found a “four by six zip-lock bag that had a white substance in it,” which the officer suspected was methamphetamine; “several other bags that had [similar] residue”; “another bag that had very small bags”; about $180 in cash; and 
3 what he suspected was marijuana. The security officer called his supervising officer, who photographed the items and called the police. ¶ 6 The police officers collected the items and submitted the white substance to a laboratory, which determined that the large bag held a substance containing 25.12 grams of methamphetamine and that two of the smaller bags held a substance containing 6.02 grams and 0.74 grams of methamphetamine, respectively. Dalton was arrested several months after his discharge from the hospital and charged with one count of possession with intent to manufacture or distribute a controlled substance and one count of possession of a controlled substance. ¶ 7 At trial, Dalton denied knowledge or ownership of the drugs. He maintained that he did not know the source of the methamphetamine or why it was found in his pants. ¶ 8 The jury found him guilty on both counts. The trial court entered a judgment of conviction on the two counts and sentenced him to three years of probation on each count, with the sentences running concurrently. 
4 II. Discussion ¶ 9 Dalton raises six principal issues on appeal. He contends that the trial court erred by (1) using, and allowing the prosecutor to use, improper analogies during voir dire; (2) allowing the prosecutor to ask Dalton whether he disagreed with the prosecution witnesses’ version of events or thought the prosecution witnesses were “not being accurate” in their testimony; (3) allowing the prosecutor to give a demonstration during his rebuttal closing argument to “create new evidence”; (4) denying Dalton’s motion for a mistrial based on the prosecutor’s allegedly improper comments during closing argument; (5) admitting the testimony of a narcotics detective who was familiar with the facts of the case as “cold” expert testimony; and (6) failing to merge Dalton’s convictions for possession with intent to manufacture or distribute a controlled substances and possession of a controlled substance. 
5 ¶ 10 Finally, Dalton argues that the alleged errors require reversal because they cumulatively deprived him of a fair trial. ¶ 11 We conclude as follows: (1) The trial court’s and the prosecutor’s use of analogies did not lower the prosecution’s burden of proof or constitute plain error requiring reversal of Dalton’s convictions. (2) The trial court did not plainly err by allowing the prosecutor to ask Dalton whether he disagreed with the prosecution witnesses and whether he thought they were “not being accurate.” (3) The prosecutor’s demonstration during the rebuttal closing did not “create new evidence” and, thus, the trial court did not err by allowing it. (4) Because Dalton cannot demonstrate prejudice resulting from the prosecutor’s allegedly improper comments, the trial court did not err by denying Dalton’s motion for a mistrial based on those comments. (5) The trial court did not plainly err by admitting the expert’s testimony. 
6 (6) The trial court plainly erred, however, by failing to merge Dalton’s convictions because possession of a controlled substance is a lesser included offense of possession with intent to manufacture or distribute where, as here, the prosecution did not demonstrate at trial that the two offenses rested on discrete quanta of drugs. ¶ 12 In addition, in light of these conclusions, there was no cumulative error. ¶ 13 For these reasons, we affirm Dalton’s judgment of conviction for possession with intent to manufacture or distribute a controlled substance but vacate his conviction and sentence for simple possession of a controlled substance. A. The Analogies ¶ 14 During voir dire, the trial court and the prosecutor used two different analogies to explain the reasonable doubt standard to the prospective jurors. In addition, the court employed a baking analogy to explain to the jury that a criminal charge consists of various elements. We conclude that, even assuming that the trial court’s and the prosecutor’s analogies explaining the reasonable doubt standard constituted error, they did not constitute plain 
7 error. Further, we conclude that the trial court did not err by using the baking analogy. 1. The Trial Court’s Home Purchase Analogy ¶ 15 In discussing the prosecution’s burden of proof, the trial court provided the prospective jurors with a definition of reasonable doubt that mirrored the pattern instruction: A reasonable doubt means a doubt that’s based upon reason and common sense which arises from a fair and rational consideration of all of the evidence or the lack of evidence in the case. It is a doubt which is not a vague, speculative or imaginary doubt, but such a doubt as would cause reasonable people to hesitate to act in matters of importance to themselves. See COLJI-Crim. B:01 (2020). ¶ 16 After reading this definition, the court said, “Yikes, that’s a lot of words. Right? What does that mean?” The court then asked the prospective jurors to raise their hands if they had purchased a home. The court engaged in the following colloquy with a prospective juror who had raised his hand: THE COURT: You go in [what looks like your dream home] and do an inspection. . . . When you go over to the closet there is a crack right in front, right on top of the door there. This is 
8 the dream home. Is that going to – the crack going to stop you from buying the house? THE JUROR: No. THE COURT: No. Say you walk in, we look at the bedroom not only is there a crack there, there is drywall on the floor. Is that going to stop you from buying the house? THE JUROR: No. THE COURT: No. Who is not going to buy the home? Yeah, some. Going in there, see the cracks, see the drywall, you open the door and it sticks, you have to pull it really hard to open. Are you going to buy the home? THE JUROR: Yes. THE COURT: You hesitated this time. THE JUROR: Yeah. ¶ 17 The court then turned to another prospective juror who had indicated he had purchased a home: THE COURT: All right. You’re hesitating, you’re not going to buy the house? THE JUROR: Depending on the inspection of the foundation. THE COURT: It’s a matter of importance to yourself, yes? You’re hesitating. THE JUROR: Correct. THE COURT: That’s reasonable doubt. You use it every[ ]day you just don’t know it. All 
9 right. We’re lawyers, we put fancy words, put them all together, right? That’s reasonable doubt, you use it every[ ]day. Is it reasonable? Is it a matter of importance to yourself, would you hesitate to act? ¶ 18 Following this colloquy, the court asked several of the prospective jurors whether they could “hold the prosecution to their burden of proof.” The jurors responded affirmatively. a. Standard of Review and Applicable Law ¶ 19 We review de novo whether the trial court accurately informed the jury of the law. People v. Waller, 2016 COA 115, ¶ 55, 412 P.3d 866, 877. Because “the Due Process Clause mandates the universal application of the reasonable doubt standard in criminal prosecutions,” Johnson v. People, 2019 CO 17, ¶ 10, 436 P.3d 529, 532, “[a]n instruction that lowers the prosecution’s burden of proof below reasonable doubt constitutes structural error and requires automatic reversal,” id. at ¶ 8, 436 P.3d at 531. For an unpreserved nonstructural error or an error involving a comment that was not an “instruction,” however, we will reverse only if the error constituted plain error. Hagos v. People, 2012 CO 63, ¶ 14, 288 P.3d 116, 120; People v. Martinez, 224 P.3d 1026, 1030 (Colo. App. 2009) (reviewing unpreserved argument regarding trial court’s 
10 comments on self-defense for plain error), aff’d on other grounds, 244 P.3d 135 (Colo. 2010). ¶ 20 Plain error is “obvious and substantial.” People v. Martinez, 2020 COA 141, ¶ 62, 486 P.3d 412, 424 (quoting Hagos, ¶ 14, 288 P.3d at 120). “To qualify as plain error, an error must generally be so obvious that a trial judge should be able to avoid it without the benefit of an objection.” Scott v. People, 2017 CO 16, ¶ 16, 390 P.3d 832, 835. To be considered this obvious, “the action challenged on appeal ordinarily ‘must contravene (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law.’” Id. (quoting People v. Pollard, 2013 COA 31M, ¶ 40, 307 P.3d 1124, 1133). An error is substantial if it “so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.” People v. Miller, 113 P.3d 743, 750 (Colo. 2005) (quoting People v. Sepulveda, 65 P.3d 1002, 1006 (Colo. 2003)). ¶ 21 “To determine whether a court’s illustration lowered the prosecution’s burden of proof, in violation of a defendant’s due process rights, and thus constitutes error, we consider the illustration’s nature, scope, and timing.” People v. Tibbels, 2019 
11 COA 175, ¶ 32, 490 P.3d 517, 524 (cert. granted June 29, 2020). We also consider the court’s instructions to the jury as a whole. Id. If, “[i]n the context of the entire record, . . . the trial court properly instructed the jury on the law — even with ‘objectionable language . . . [in] the trial court’s elaboration of the reasonable doubt instruction’ — then there is no violation of due process.” Johnson, ¶ 14, 436 P.3d at 533 (alterations in original) (quoting People v. Sherman, 45 P.3d 774, 779 (Colo. App. 2001)). b. Because the Court’s Home Purchase Analogy Did Not Lower the Burden of Proof, Automatic Reversal Is Not Required ¶ 22 While we “acknowledge the possibility that the jury might have viewed the concept of reasonable doubt through the lens of the court’s” home purchase analogy, following the supreme court’s guidance in Johnson, we conclude that the analogy did not lower the prosecution’s burden of proof for two reasons. Tibbels, ¶ 35, 490 P.3d at 525. ¶ 23 First, as in Johnson and Tibbels, the court gave the home purchasing analogy during voir dire. Neither the court nor the parties referenced or used the analogy again after the jury was selected. Id. at ¶ 37, 490 P.3d at 525. 
12 ¶ 24 Second, before providing the analogy and after the close of evidence, “the court properly instructed the jury on reasonable doubt in accordance with the Model Jury Instructions, both verbally and in writing.” Id. at ¶ 39, 490 P.3d at 525 (“We presume that the jury understood and followed the court’s instructions.”); Johnson, ¶ 14, 436 P.3d 533. Thus, the record reflects that the trial court properly instructed the jury on the law. See Johnson, ¶ 14, 436 P.3d at 533. ¶ 25 For these reasons, we conclude that the trial court’s home purchase analogy did not impermissibly lower the prosecution’s burden of proof and does not require reversal. ¶ 26 We note that the trial court made an additional problematic comment not addressed in Tibbels or Johnson: it told the jury that certain of the jurors’ hesitation in responding to the house purchase analogy was “reasonable doubt. You use it every[ ]day[,] you just don’t know it.” But because “[f]ew decisions that people make have the gravity of deciding whether to convict an accused person of a crime,” saying that jurors frequently apply the reasonable doubt standard is “simply untrue.” People v. Knobee, 
13 2020 COA 7, ¶¶ 38-39, 490 P.3d 543, 549-50 (cert. granted June 29, 2020). ¶ 27 Trial courts improperly trivialize the prosecution’s burden of proof when they compare it to an everyday or routine decision. Id. (collecting cases). But regardless of the trial court’s statement about everyday decisions, people only infrequently purchase a home. Significantly, the home purchase was the only analogy the trial court discussed with the jurors; it did not provide the jury with an example of a truly everyday decision to attempt to explain the concept of reasonable doubt. Cf. id. at ¶¶ 38-40, 490 P.3d at 549-50 (holding that trial court’s analogy of reasonable doubt to “choosing a doctor ‘or whatever’” trivialized the burden of proof); People v. Avila, 2019 COA 145, ¶¶ 42-48, 457 P.3d 771, 780-81 (analyzing trial court’s analogy likening the reasonable doubt standard to buying produce). Thus, we conclude that the trial court’s single, isolated comment about using reasonable doubt “every day” in the context of the home purchase analogy also did not impermissibly lower the prosecution’s burden of proof. 
14 c. Even if the Home Purchase Analogy Lowered the Prosecution’s Burden of Proof, Automatic Reversal Is Not Required Because the Analogy Was Not an Instruction by the Trial Court ¶ 28 Even if the court’s home purchase analogy improperly lowered the prosecution’s burden of proof, automatic reversal is not required if the analogy did not constitute an “instruction.” Johnson requires automatic reversal for instructions that lower the burden of proof. See Johnson, ¶ 8, 436 P.3d at 531. So we next consider whether the home purchase analogy was an instruction or merely an illustration or example, which does not require reversal even if it lowers the prosecution’s burden of proof. See id.; Knobee, ¶¶ 72-75, 490 P.3d at 554-55 (Dailey, J., concurring in part and dissenting in part). ¶ 29 In Deleon v. People, 2019 CO 85, 449 P.3d 1135, the trial court had commented to the jurors during voir dire that the defendant had no obligation to present evidence or testimony, and “d[id] not have to testify.” Id. at ¶ 4, 449 P.3d at 1136. But the final instructions the trial court read to the jury did not include the pattern no-adverse-inference instruction. Id. at ¶ 7, 449 P.3d at 1137. The supreme court held that the trial judge’s comments during voir dire did not constitute an instruction for four reasons: 
15 (1) “they were given during the early stages of the trial process”; (2) “they were made with the purpose of determining potential juror mindset”; (3) “they indicated that the jury would receive further instructions later in the trial”; and (4) “when the instructions were read prior to closing arguments, the jury was told by the judge that the instructions were the law [it] must follow.” Id. at ¶ 15, 449 P.3d at 1137-38. Because each of these reasons also applies to the trial court’s home purchase analogy here, that analogy was not an instruction. ¶ 30 First, like the trial court’s comments in Deleon, the trial court gave the home purchase analogy during voir dire and, thus, during “the early stages of the trial process.” Id. ¶ 31 Second, the record demonstrates that the court employed the analogy to determine “whether the potential jurors could act impartially and conscientiously apply the law,” rather than to instruct the potential jurors on the law. Id. at ¶ 26, 449 P.3d at 1140. Indeed, after discussing the analogy with two of the potential jurors, the court asked them whether they believed they could be fair and impartial. 
16 ¶ 32 Third, before opening statements, the trial court announced that it would instruct the jury on the law later in the case: At the conclusion of the evidence I will tell you what the rules of law are which you are to use . . . in reaching your verdict. I will read those rules of law to you and you will be allowed to take them with you to the jury room during your deliberations. . . . . It is my job to decide what rules of law apply to the case. You must follow all the rules as I explain them to you. You must not follow some and ignore others. Even if you disagree or do not understand the reasons for some of the rules, you must follow them. You will then apply these rules to the facts which you have determined from the evidence and in this way you will determine whether the prosecution has proven the guilt of the Defendant beyond a reasonable doubt. Because the court told the jurors it had not yet instructed them on the law, the home purchase analogy during voir dire could not have been an instruction. ¶ 33 Fourth, before reading the jury instructions, the court again told the jury that it “must follow the instructions” the court gave them, and that it must reach its decision “by applying the rules” the court provided “to the evidence presented at trial.” 
17 ¶ 34 Further, in addition to the factors described in Deleon, the court did not provide the home purchase analogy to the jury in writing, unlike the instructions the court provided following closing arguments. This factor also supports our conclusion that the home purchase analogy was an illustration, rather than an instruction. See Tibbels, ¶ 38, 490 P.3d at 525. ¶ 35 Because the trial court’s home purchase analogy was not an instruction, automatic reversal is not required, even if the analogy lowered or trivialized the burden of proof. See Johnson, ¶ 8, 436 P.3d at 531; Knobee, ¶ 76, 490 P.3d at 554 (Dailey, J., concurring in part and dissenting in part). d. Even if the Trial Erred by Giving the Home Purchase Analogy, It Was Not Plain Error ¶ 36 Although the trial court’s home purchase analogy did not constitute structural error because it was not an instruction that impermissibly lowered the prosecution’s burden of proof, we must still review it for plain error. See Knobee, ¶¶ 71-72, 490 P.3d at 555 (Dailey, J., concurring in part and dissenting in part); People v. Baca, 2015 COA 153, ¶¶ 11-13, 378 P.3d 780, 784, overruled on other grounds by Gonzalez v. People, 2020 CO 71, 471 P.3d 1059. 
18 Even assuming that the trial court erred by discussing the analogy with the jury, such error was not obvious. Thus, we perceive no plain error. See Scott, ¶ 18, 390 P.3d at 835. ¶ 37 Contrary to Dalton’s assertion, under the plain error analysis, we consider whether the error was obvious at the time of the defendant’s trial, and not at the time of appeal. People v. Hagos, 250 P.3d 596, 620 (Colo. App. 2009); see also People v. O’Connell, 134 P.3d 460, 465 (Colo. App. 2005). At the time of Dalton’s trial, the only published Colorado appellate decisions holding that a court erred by using, or allowing the use of, an analogy to explain the beyond a reasonable doubt standard involved a jigsaw puzzle analogy. See People v. Van Meter, 2018 COA 13, ¶ 31, 421 P.3d 1222, 1230; People v. Camarigg, 2017 COA 115M, ¶¶ 49-53, 488 P.3d 267, 276-77; People v. Carter, 2015 COA 24M-2, ¶¶ 58-61, 402 P.3d 480, 492. ¶ 38 And even those cases did not hold that a court could never use or allow a puzzle analogy. For example, the division in Camarigg noted that a puzzle analogy “may be permissible when used to explain the difference between proof beyond all doubt and proof beyond a reasonable doubt,” and said the analogy is only improper 
19 if it trivializes the state’s burden, equates the beyond a reasonable doubt standard to an everyday decision, or uses iconic images that invite the jury to jump to a conclusion about a defendant’s guilt. Camarigg, ¶¶ 43-47, 488 P.3d at 275-76. None of these cases addressed whether other types of analogies, such as home purchase analogies, are improper. ¶ 39 Even the division in People v. Cevallos-Acosta, which considered a prosecutor’s use of a home purchase analogy, did not conclude the analogy was improper. 140 P.3d 116, 123 (Colo. App. 2005). Rather, applying the plain error standard, the division concluded that, although the prosecutor’s “definition of reasonable doubt during voir dire did not track” the model jury instruction on reasonable doubt, there was no plain error because the analogy did not undermine the fundamental fairness of the trial. Id. at 124. 2. The Prosecutor’s Flag Stealing Analogy ¶ 40 The prosecutor used a different analogy to describe the concept of reasonable doubt to the prospective jurors. He began by pointing out the American flag behind the bench. He then engaged in the following dialogue with a prospective juror: 
20 THE PROSECUTOR: What if . . . I brought in people to tell you that last night they saw me break into [the presiding judge’s] office and in her chambers, I scaled up the wall, I busted in through the window, I took her keys to her courtroom, I came in here, and I switched the flag. And that flag doesn’t have fifty stars, it doesn’t have thirteen stripes, it’s only got twelve stripes. It’s only got forty-eight stars. Is that in the realm of possibility? THE JUROR: No. THE PROSECUTOR: Do you think I could pull that off, right? That’s something — it’s not. But there’s some speculation, right, that maybe that’s not the American flag . . . . . . . . Security here twenty-four hours, nobody tries to do that, right? Right. And maybe I don’t get away with that, right? But I can pose to you some hypothetical, speculative scenario where maybe that piece of cloth doesn’t have fifty stars on it, right? THE JUROR: I would count it. THE PROSECUTOR: Right. You would want to count it. But then you would believe beyond all doubt, right? THE JUROR: If I counted it and it wasn’t accurate, yeah. THE PROSECUTOR: Okay. But what’s our burden? THE JUROR: Reasonable. 
21 THE PROSECUTOR: So we have to prove beyond a reasonable doubt. So we’re not going to give you thirteen stripes and let you count it and measure it, we’re going to show you the evidence and tell you it’s beyond a reasonable doubt. ¶ 41 The prosecutor then asked the prospective jurors whether they could “hold [the prosecution] to that standard, not one that’s a one hundred percent or a sure thing?” a. Standard of Review and Applicable Law ¶ 42 Because Dalton did not object to the prosecutor’s use of the stolen flag analogy, we review for plain error. Hagos, ¶ 14, 288 P.3d at 120. ¶ 43 A prosecutor “may not misstate the evidence or the law.” Van Meter, ¶ 24, 421 P.3d at 1229. Although a prosecutor “may employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance,” the prosecutor may not “induce the jury to determine guilt on the basis of passion or prejudice, attempt to inject irrelevant issues into the case, or accomplish some other improper purpose,” such as lessening the state’s burden of proof. People v. Allee, 77 P.3d 831, 837 (Colo. App. 2003). “Prosecutorial misconduct rarely constitutes plain error,” however, Carter, ¶ 53, 
22 402 P.3d at 491, especially where the record reflects that the trial court “properly instructed the jury on the state’s burden of proof and the definition of reasonable doubt.” People v. Sauser, 2020 COA 174, ¶ 93, ___ P.3d ___, ___. b. Even Assuming the Trial Court Erred by Allowing the Prosecutor to Use an Analogy to Explain Reasonable Doubt, the Error Was Not Obvious ¶ 44 Even assuming, without deciding, that the trial court erred by allowing the prosecutor to use the flag stealing analogy to explain the concept of reasonable doubt, we are not persuaded that the error was obvious and thus subject to reversal under the plain error standard. See Carter, ¶ 58, 402 P.3d at 492. ¶ 45 As explained above, supra Part II.A.1.d, the only published decisions disapproving of a reasonable doubt analogy announced before Dalton’s trial involved jigsaw puzzle analogies. See Van Meter, ¶ 31, 421 P.3d at 1230; Camarigg, ¶¶ 49-53, 488 P.3d at 276-77; Carter, ¶¶ 58-61, 402 P.3d at 492. Thus, at the time of trial, the prosecutor’s reasonable doubt analogy did not clearly controvert Colorado case law and was not “so obvious” that the court should have disallowed it “without the benefit of an objection.” Scott, ¶ 16, 390 P.3d at 835. 
23 ¶ 46 Although we conclude that neither the trial court’s home purchase analogy nor the prosecutor’s flag stealing analogy requires reversal, because analogies regarding the reasonable doubt standard do not provide clarity to the jury and can improperly lower the prosecution’s burden of proof, see Johnson, ¶ 13, 436 P.3d at 532-33, “[l]awyers and trial courts should avoid using analogies when explaining the concept of reasonable doubt to a jury.” Sauser, ¶ 88, ___ P.3d at ___. 3. The Trial Court’s Baking Analogy ¶ 47 Later during voir dire, the trial court used a baking analogy to explain that “[e]ach of the[] [criminal] counts [has] elements of the offense.” The elements of the offense, the court explained, “are like a recipe for baking. . . . [E]ach . . . recipe[] ha[s] different ingredients, that’s kind of how each of these counts work [sic]. Each of these counts [has] ingredients, or elements, to comprise the full count.” ¶ 48 After providing this analogy, the court reviewed the elements of each crime with which Dalton was charged. Later, when describing the duties of a juror, the court returned to the baking analogy: “I read to you the elements, the list, the recipe, so to 
24 speak. Your job, as a juror, is to determine whether or not the prosecution has proven each and every one of those elements.” ¶ 49 Because the trial court’s baking analogy did not concern the reasonable doubt standard, we address it separately from the trial court’s home purchase analogy. ¶ 50 Dalton has not provided any authorities in support of his argument that the baking analogy was improper, other than the authorities concerning analogies that seek to explain reasonable doubt. Thus, we conclude that Dalton has not demonstrated that the trial court erred by employing the baking analogy and that, even if the court’s use of the analogy was error, the error was neither obvious nor substantial. ¶ 51 For the above reasons, we hold that the court’s and the prosecutor’s analogies did not constitute plain error and, thus, do not require reversal of Dalton’s convictions. B. The Prosecutor’s Questions Regarding Dalton’s Disagreement with the Prosecution Witnesses’ Testimony ¶ 52 Dalton argues that certain of the prosecutor’s questions to him during cross-examination were improper because they required him 
25 to comment on the veracity of the prosecution’s witnesses. We disagree. 1. Additional Facts ¶ 53 Dalton testified at trial. On direct examination, Dalton said that the deputies searched him twice before transporting him to the hospital, and that those searches were more thorough than mere pat-downs for weapons. Dalton said that the deputies pulled out his pockets, in which they found his wallet and a lighter, but no methamphetamine. ¶ 54 On cross-examination, Dalton admitted that he had told the deputies there had been a shoot-out in his house and that other people inside the house were involved, although he claimed those statements were “supposed to be a joke.” The prosecutor then asked Dalton whether the officers had been lying when they testified that Dalton was yelling from inside the house and had claimed that his legs were broken. Defense counsel did not object to this question. ¶ 55 After Dalton responded that he believed the deputies were lying about “[s]ome of” the statements they attributed to him, the prosecutor asked Dalton, “So you believe that they were lying about 
26 some of the statements[?]” Defense counsel objected to the question, and the trial court sustained the objection. The prosecutor then asked whether Dalton “disagree[d] with some of” the deputies’ testimony. Dalton responded affirmatively. ¶ 56 The prosecutor next turned to Dalton’s testimony regarding the deputies’ searches of his person before he was transported to the hospital. He asked Dalton whether “the officers were not being truthful yesterday in their testimony” about the extensiveness of the searches. Defense counsel objected, and the trial court sustained the objection. The prosecutor rephrased the question, asking Dalton whether he “disagree[d] with [the deputies’] version of events.” Dalton responded, “Yes, I do.” ¶ 57 The prosecutor also asked Dalton whether the deputies were “not being accurate in their statements” when they testified that “they simply patted [him] down.” Dalton responded, “No, they’re not.” Finally, the prosecutor asked Dalton whether he “disagree[d] with [the deputies’] statement[s]” about the search, and Dalton said, “I do, yes.” 
27 ¶ 58 During closing argument, defense counsel told the jury it would have been impossible for the deputies to have missed methamphetamine on Dalton’s person during their searches: [I]t makes no sense that multiple trained law enforcement officers executing the most basic function that a law enforcement officer does determining whether someone has anything suspicious on their person would miss more than thirty grams of methamphetamine. They didn’t feel anything unusual in Marlow Dalton’s pockets because there wasn’t anything unusual in Marlow Dalton’s pockets. They didn’t feel any methamphetamine in Mr. Dalton’s pocket because there was no methamphetamine in Mr. Dalton’s pockets. ¶ 59 In his rebuttal closing, the prosecutor argued that because, as the deputies testified, they were only looking for a weapon at the time they removed Dalton from the house, the deputies “could have missed this methamphetamine.” The prosecutor said the jury could not believe Dalton’s testimony to the contrary unless they believed that the deputies “just told you a big story in order to frame” Dalton. The prosecutor similarly said that the jurors could believe the hospital security officer’s testimony that he “simply logg[ed] in [Dalton’s] property and found these drugs” or the jurors could believe that the security officer “planted them.” 
28 ¶ 60 The prosecutor further asserted that the jury could either believe the deputies and the security officer or could “believe that this is a conspiracy against Mr. Dalton. Those are the options. There’s not a third left. There’s the reasonable outcome which requires a verdict of guilty.” Defense counsel objected to the statement that “[t]here’s not a third” option, and the trial court sustained the objection. 2. Standard of Review and Applicable Law ¶ 61 We need not consider Dalton’s arguments regarding the prosecutor’s questions to which the court sustained defense counsel’s objections. See People v. Jamison, 2018 COA 121, ¶ 37, 436 P.3d 569, 576-77 (holding that the court “need not consider” allegedly improper comments to which defense counsel successfully objected and requested no further relief (quoting People v. Douglas, 2012 COA 57, ¶ 65, 296 P.3d 234, 249)). Thus, we only review Dalton’s challenges to the questions regarding whether he disagreed with the deputies’ version of events or whether he thought the deputies were “not being accurate” in their testimony. See id. Because defense counsel did not object to these questions, we review for plain error. As noted above, to establish that the trial 
29 court plainly erred by allowing the questions, Dalton must demonstrate that the error was obvious and substantial. Hagos, ¶ 18, 288 P.3d at 120. ¶ 62 In Liggett v. People, 135 P.3d 725 (Colo. 2006), the supreme court held that questions “asking a witness to opine on the veracity of another witness” are categorically improper because they are “prejudicial, argumentative, and ultimately invade[] the province of the fact-finder.” Id. at 732. The court concluded that the trial court erred by allowing the prosecutor to ask the defendant whether he thought another witness “was lying” or was “mistaken.” Id. at 733-34. 3. The Trial Court Did Not Plainly Err by Allowing the Prosecutor to Ask Dalton Whether He Disagreed with the Prosecution’s Witnesses or Thought They Were “Not Being Accurate” ¶ 63 Liggett did not address whether it is improper to ask a witness whether he or she “disagrees” with another witness’s testimony or believes another witness is “not being accurate.” Dalton contends that these questions are the functional equivalent of asking a witness whether he or she believes another witness is “mistaken” and, thus, run afoul of Liggett. 
30 ¶ 64 We need not reach this issue, however, because we conclude that the prosecutor’s questions did not undermine the fundamental fairness of the trial and thus did not rise to the level of plain error. These questions — whether Dalton disagreed with the deputies’ testimony or believed the deputies were “not being accurate” in their testimony — were part of a longer line of questioning. See People v. Herr, 868 P.2d 1121, 1124 (Colo. App. 1993) (holding that improper questions did not undermine the fairness of the trial in part because they were “brief” and “not repeated during the prosecutor’s summation”). The absence of a defense objection to the two types of questions may also demonstrate the “defense counsel’s belief that the live argument, despite its appearance in a cold record, was not overly damaging.” People v. Rodriguez, 794 P.2d 965, 972 (Colo. 1990) (quoting Brooks v. Kemp, 762 F.2d 1383, 1397 n.19 (11th Cir. 1985)). ¶ 65 Moreover, the prosecution presented substantial evidence of Dalton’s guilt. See People v. Gallegos, 260 P.3d 15, 28 (Colo. App. 2010) (holding that improper statement by prosecutor “was unlikely to affect the verdict” where substantial evidence supported the defendant’s conviction). Dalton did not deny that the security 
31 officer found methamphetamine in his pants. Rather his defense rested on his argument that he did not know the source of the methamphetamine or why it was found in his pants. Because the error was not substantial, it was not plain. See Scott, ¶ 16, 390 P.3d at 835. C. The Prosecutor’s Demonstration During Rebuttal Closing ¶ 66 Dalton contends that the trial court erred by overruling his objection to the prosecutor’s use of a demonstration during rebuttal closing argument. We reject this contention. 1. Additional Facts ¶ 67 In his closing argument, defense counsel argued that, if the jury believed the deputies’ testimony that they only performed a pat-down search of Dalton for weapons, the jury could nonetheless reasonably doubt whether Dalton possessed methamphetamine on his person at that time. He argued that “when you pat someone down, and there’s thirty-one grams of methamphetamine in their pockets, you feel it. That is something you take notice of as law enforcement officers.” ¶ 68 The prosecutor began his rebuttal closing argument by asserting, “[I]f I place the incredible amount of methamphetamine 
32 that’s as [defense counsel] would like to describe it on my person, I don’t have a brick . . . .” The prosecutor then placed next to his body the bag of methamphetamine that had been introduced into evidence. ¶ 69 Defense counsel objected to this demonstration, arguing that the evidence did not establish how the bag of methamphetamine would appear on a specific individual’s person. The trial court overruled the objection. ¶ 70 The prosecutor continued with the demonstration, saying to the jurors, “As you can see [the bag isn’t] bulging from my person. This isn’t a brick of drugs.” 2. Standard of Review and Applicable Law ¶ 71 “We review claims of prosecutorial misconduct in closing argument for abuse of discretion.” People v. Lucas, 232 P.3d 155, 165 (Colo. App. 2009). “A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair.” People v. Palacios, 2018 COA 6M, ¶ 18, 419P.3d 1014, 1018. “Claims of improper argument must be evaluated in the context of the argument as a whole and in light of the evidence before the jury.” People v. Shepherd, 43 P.3d 693, 697 (Colo. App. 2001). 
33 3. The Trial Court Did Not Err by Overruling Dalton’s Objection to the Prosecutor’s Demonstration ¶ 72 Dalton rests his argument regarding the prosecutor’s demonstration on an Iowa case, State v. Pepples, 250 N.W.2d 390 (Iowa 1977). In Pepples, the prosecutor sought to demonstrate to the jury that the defendant’s pistol would not fire unless a finger pulled the trigger: “Keeping his finger off the trigger, [the prosecutor] struck the weapon, which was cocked and unloaded, against [a statute book] about six times, progressively harder each time. The hammer did not fall.” Id. at 395. But, even in that case, because the pistol was already in evidence, and the firearms expert had “testified to its trigger-pull characteristics,” the court concluded that the demonstration was “technically within the scope of the evidence at trial . . . .” Id. at 396. ¶ 73 Dalton argues that the prosecutor’s demonstration at his trial was more problematic than the demonstration in Pepples because, in that case, “a firearms expert had already testified to the point that the demonstration was meant to illustrate and, in contrast, none of the witnesses at his trial had testified on the question of 
34 whether the amount of methamphetamine in question” would “bulg[e]” from someone’s body. ¶ 74 Yet the methamphetamine the prosecutor used in his demonstration was already in evidence, and the deputies had testified that they patted down Dalton for weapons and, not, as defense counsel suggested, “for some items that seem out of place or don’t belong.” Further, although defense counsel objected that the information provided through the demonstration was “nowhere in evidence,” Dalton has not provided us with any authorities holding a demonstration based solely upon admitted evidence “create[s] new evidence.” For these reasons, we conclude that the trial court did not err by overruling Dalton’s objection to the prosecutor’s demonstration. D. The Motion for a Mistrial ¶ 75 Dalton urges us to hold that the trial court erred by denying his motion for a mistrial based on several comments that the prosecutor made during his rebuttal closing argument. But we will not consider challenges to comments to which defense counsel successfully objected and where defense counsel requested no further relief. See People v. Douglas, 2012 COA 57, ¶ 65, 296 P.3d 
35 234, 249 (declining to consider an alleged error where “defendant’s contemporaneous objection to the [prosecutor’s] comment was sustained, and he requested no further relief”). We find no merit to Dalton’s argument that the trial court erred by not granting him a mistrial. 1. Additional Facts ¶ 76 During rebuttal closing argument, defense counsel objected to four of the prosecutor’s comments, and the trial court sustained each objection:  “[T]he defense, if there is one . . . .”  “[T]he defense would like you to muddy the water . . . .”  “You can either believe that [the hospital security officer] was doing his job at a hospital and simply logging in [Dalton’s] property and found these drugs, or you can think that he planted them. You can believe that the Thornton police did everything that they’re supposed to do in collecting these drugs, having them tested, that the expert did everything that she did by the book, or you can believe that this is a conspiracy against Mr. Dalton. Those are the options. There’s not a third left.” 
36  “Folks, you can either believe speculation, illogical theories that are thrown to the wall. Or you can believe —” ¶ 77 The court reminded the jurors following the closing arguments that they are “to rely on [their] own recollection of the evidence in this case. Closing arguments are not evidence.” After the jurors left the courtroom, defense counsel moved for a mistrial based on the prosecutor’s four comments, arguing that “there’s no other portion of the trial in which some curative action can be taken.” The trial court denied the motion, noting that the “comments made by the prosecution . . . were brief” and “admonished by the court immediately.” It also reminded defense counsel that the jury “was again provided information that closing arguments were not evidence of any type.” 2. Standard of Review and Applicable Law ¶ 78 “A mistrial is a drastic remedy and is warranted only when prejudice to the accused is so substantial that its effect on the jury cannot be remedied by other means.” People v. Ned, 923 P.2d 271, 274 (Colo. App. 1996). Because “the trial court is best positioned to evaluate whether any statements made by counsel affected the 
37 jury’s verdict,” Domingo-Gomez v. People, 125 P.3d 1043, 1049 (Colo. 2005), “‘the decision to grant or deny a motion for a mistrial is directed to the sound discretion of the trial court,’ and the court’s decision ‘will not be disturbed absent a clear showing of an abuse of discretion and prejudice to the defendant.’” People v. Santana, 255 P.3d 1126, 1130 (Colo. 2011) (quoting Bloom v. People, 185 P.3d 797, 807 (Colo. 2008)). “To demonstrate prejudice to the accused, there must be a reasonable possibility that extraneous information or influence affected the verdict.” People v. Dore, 997 P.2d 1214, 1221 (Colo. App. 1999). 3. The Trial Court Did Not Err by Denying Dalton’s Motion for a Mistrial ¶ 79 We conclude that the trial court did not abuse its discretion by denying Dalton’s motion. While, as Dalton notes, the trial court incorrectly stated that the “manifest necessity” standard applied to the defense’s motion, the trial court also articulated the correct standard for a mistrial: “[M]istrial[] is a most drastic of remedies in a case and is to be granted only when prejudice incurred is too substantial.” See Ned, 923 P.2d at 274. (The “manifest necessity” standard only applies when the prosecution moves for a mistrial. 
38 See United States v. Sanford, 429 U.S. 14, 16 n.2 (1976) (per curiam); People v. Espinoza, 666 P.2d 555, 558 (Colo. 1983).) ¶ 80 Moreover, although Dalton contends on appeal that the trial court’s curative instruction was insufficient to remedy any prejudice resulting from the prosecutor’s comments, he does not explain how the prosecutor’s comments prejudiced him. See Ned, 923 P.3d at 275 (“Speculation of prejudice is insufficient to warrant reversal of a trial court’s denial of a motion for mistrial.”). E. The Detective’s Expert Testimony ¶ 81 Dalton contends that the trial court erred by allowing the prosecution’s expert witness on drug investigations to testify as a “cold” (or “blind”) expert. (“A ‘blind’ or ‘cold’ expert knows little or nothing about the facts of a particular case, often has not met the victim, and has not performed any forensic or psychological examination of the victim (or the defendant).” People v. Cooper, 2019 COA 21, ¶ 2, ___ P.3d ___, ___, rev’d on other grounds, 2021 CO 69, ___ P.3d ___.) We are not persuaded. 1. Additional Facts ¶ 82 The prosecution called Detective Jon Paul Matzke to testify as an “expert in drug investigations.” The prosecution did not offer 
39 Detective Matzke as a cold expert because he had “look[ed] at the CBI reports as well as the police reports in this case,” and was thus “aware of the amount of drugs, . . . the baggies, and that’s what he based his previously written report off of.” The court expressed concern if counsel “dr[e]w any correlation between the evidence in this case” and Detective Matzke’s experience in drug investigations. For this reason, the trial court prohibited Detective Matzke from “testify[ing] as to his review of evidence in this case, or draw[ing] any correlation [between] what he reviewed or knows the evidence in this case to be . . . and his opinion.” ¶ 83 Even though the prosecutor did not offer Detective Matzke as a cold expert, defense counsel objected to this ruling: The prosecution doesn’t have a blind expert. They have an expert who has knowledge of exactly what is alleged to have occurred in this case. So I don’t know that they can put the cat back in the bag and simply call him a blind expert when everyone, including himself, knows that he’s not. The trial court noted the objection but ruled that “there will be absolutely no questions posed to [Detective Matzke] about his review of the evidence in this case or his knowledge of anything in this case.” 
40 ¶ 84 The prosecutor asked Detective Matzke to testify “about generally what you would see in drug distribution and drug possession cases . . . .” Detective Matzke said that, in cases of drug distribution, he would typically see larger quantities of drugs than in cases involving drugs for personal use. He also testified that distribution cases typically involve evidence such as “small baggies” for distributing smaller amounts of drugs, scales, and “cash to make change . . . .” ¶ 85 After Detective Matzke had testified and the jury had been excused for lunch, defense counsel asked the court for leave to make a further record regarding his objection to the detective’s testimony. Defense counsel pointed out that Detective Matzke “referenced fourteen baggies, we have fourteen baggies in this case. Detective Matzke knows we have fourteen baggies in this case because he reviewed the discovery in preparation for testimony as an expert.” He also noted that the detective “testified almost very close to the number of the numerical value of the methamphetamine in this case.” (It appears that defense counsel argued that Detective Matzke had “tailored” his testimony to the 
41 facts of the case, even though defense counsel did not expressly refer to “tailoring.”) ¶ 86 In response, the trial court pointed out that defense counsel’s “only objection [to the contents of Detective Matzke’s testimony] was at the end of his testimony. . . . I didn’t hear any objections as the testimony was going on concerning any fact specific or alleged fact specific testimony in this matter.” 2. Standard of Review and Applicable Law ¶ 87 “We review a trial court’s evidentiary decisions for an abuse of discretion.” Venalonzo v. People, 2017 CO 9, ¶ 15, 388 P.3d 868, 873 (citation omitted). ¶ 88 “Objections must be both specific and timely. ‘It does not suffice to give trial courts a post-hoc opportunity to consider an alleged error.’” People v. Randell, 2012 COA 108, ¶ 83, 297 P.3d 989, 1005 (citing and quoting People v. McNeely, 222 P.3d 370, 374-75 (Colo. App. 2009)). Thus, an argument “is unpreserved and thereby forfeited (subject only to plain error review) unless it is made in time for the trial court to avoid the alleged error.” Id. (quoting McNeely, 222 P.3d at 374). In addition, contentions of error raised for the first time on appeal are also unpreserved and 
42 subject to plain error review. People v. Tillery, 231 P.3d 36, 44 (Colo. App. 2009), aff’d sub nom. People v. Simon, 266 P.3d 1099 (Colo. 2011). 3. The Trial Court Did Not Plainly Err by Admitting Detective Matzke’s Expert Testimony ¶ 89 Although Dalton contends on appeal that the trial court erred by “allowing [Detective Matzke] who was familiar with the facts of this case to offer testimony as a ‘blind’ expert,” the prosecution did not offer Detective Matzke as such an expert and the trial court did not allow him to testify as one. Thus, we perceive no merit in this claim of error. ¶ 90 Because Dalton did not timely raise his tailoring argument challenging Detective Matzke’s testimony, we review it for plain error. Randell, ¶ 83, 297 P.3d at 1005. As the trial court pointed out, defense counsel did not object during the detective’s testimony and only sought to supplement the record after the detective had been excused. Defense counsel did not preserve this argument because the trial court had only a post-hoc opportunity to consider the alleged error. See id. 
43 ¶ 91 In addition, Dalton argued for the first time on appeal that the trial court’s ruling regarding Detective Matzke’s testimony improperly prevented the jury from considering “critical information that may have led it to view Detective Matzke’s testimony in a drastically different light,” based on a single law review article addressing the impact of cold expert testimony on jury verdicts. ¶ 92 Because Dalton does not cite to any authority binding on a Colorado trial court in support of these arguments, we conclude that, even assuming the trial court erred by limiting the scope of Detective Matzke’s testimony, such error was not plain. See Scott, ¶ 16, 390 P.3d at 835 (“To qualify as plain error, an error must generally be so obvious that a trial judge should be able to avoid it without the benefit of an objection.”). F. Merger ¶ 93 Dalton contends that the trial court erred by failing to merge his convictions for possession of a controlled substance and possession with intent to manufacture or distribute a controlled substance, on the grounds that the former is a lesser included offense of the latter. We agree. 
44 1. Standard of Review and Applicable Law ¶ 94 The Double Jeopardy Clauses of the United States and Colorado Constitutions “protect an accused not only from facing a second trial for the same offense but also from suffering multiple punishments for the same offense.” Reyna-Abarca v. People, 2017 CO 15, ¶ 49, 390 P.3d 816, 824. “Whether convictions for different offenses merge is a question of law that we review de novo.” Page v. People, 2017 CO 88, ¶ 6, 402 P.3d 468, 469. We review unpreserved double jeopardy claims for plain error. Reyna-Abarca, ¶ 5, 390 P.3d at 818. ¶ 95 If one offense is a lesser included offense of another, a defendant may not be convicted of both. Id. at ¶ 51, 390 P.3d at 824. “[A]n offense is a lesser included offense of another offense if the elements of the lesser offense are a subset of the elements of the greater offense, such that the lesser offense contains only elements that are also included in the elements of the greater offense.” Id. at ¶ 64, 390 P.3d at 826. ¶ 96 Dalton was charged with and convicted of possession with intent to manufacture or distribute a controlled substance weighing more than 7 but not more than 112 grams, under section 
45 18-18-405(1), (2)(b)(I)(B), C.R.S. 2020, and possession of a controlled substance weighing more than 2 grams under section 18-18-403.5(1), (2)(a), C.R.S. 2020. ¶ 97 Possession with intent to manufacture or distribute a controlled substance under section 18-18-405(1) is a level 2 drug felony if the person “possess[es] with intent to manufacture, dispense, sell, or distribute” more than 7 but not more than 112 grams of methamphetamine. § 18-18-405(1), (2)(b)(I)(B). Possession of a controlled substance is a level 4 drug felony if the person “knowingly . . . possess[es]” methamphetamine. § 18-18-403.5(1), (2)(a). ¶ 98 Logically, a person cannot possess a controlled substance with intent to manufacture or distribute that controlled substance unless the person knowingly possesses the controlled substance. Thus, possession of a controlled substance under section 18-18-403.5 is a lesser included offense of possession with intent to manufacture or distribute under section 18-18-405(1) “when the possession and distribution charges arise out of actions involving a single ‘discrete quantum of drugs.’” People v. Davis, 2015 CO 36M, ¶ 35, 352 P.3d 950, 957. 
46 2. The Trial Court Plainly Erred by Not Merging Dalton’s Convictions ¶ 99 Whether Dalton’s conviction for possession must merge into his conviction for possession with intent to manufacture or distribute “hinges on whether the prosecution provided sufficient evidence to show the existence of more than one quantum of drugs.” Id. at ¶ 36, 352 P.3d at 958. We conclude that it did not. ¶ 100 The 34.7 grams of a substance containing methamphetamine found in Dalton’s clothing was divided among three bags, which held substances containing 25.12 grams, 6.02 grams, and 0.74 grams of methamphetamine, respectively. The prosecution did not present evidence that Dalton “possessed and [intended to] distribute[] different quanta of drugs,” much less prove this fact beyond a reasonable doubt. Davis, ¶ 40, 352 P.3d at 958. Rather, the prosecution’s arguments regarding both offenses rested on the same quantities of methamphetamine. ¶ 101 Although some of the methamphetamine was bagged separately, the prosecution did not differentiate the amounts in the bags by different occasions, different purposes, or different potential recipients or users of the drugs. See People v. Abiodun, 111 P.3d 
47 462, 471 (Colo. 2005) (listing, nonexclusively, factors to consider in distinguishing separate drug trafficking crimes such as “distributions of a different quantum of drugs to different recipients, or to the same recipient on different occasions,” and “proximity in space and time, intervening events, and volitional departures”). Rather, the prosecution treated the drugs as a single unit during trial, emphasizing the amount and separate bagging of the methamphetamine in support of its argument that Dalton committed the offense of possession with intent to manufacture or distribute. For example, during closing argument, the prosecutor said on November 19th of 2016, Marlow Dalton . . . possessed with the intent to distribute and/or sell methamphetamine. . . . . [A]s [the hospital security officer] pulled out [Dalton’s] pants, baggies fell out. Baggies consisting of a white crystal like substance. It’s not just one baggy, this is the largest. . . . There [are] two other small baggies, same crystal like substance, for a total of three. . . . . [Dalton] was in possession of that methamphetamine. Over 30 grams of 
48 methamphetamine, 14 individual baggies unused and over $180. . . . . That first bag [the forensic scientist] said weighed over 25 grams. The second bag over six. One of the questions in the jury instructions is, Does this substance weigh more than seven but less than 112 grams? It absolutely does. . . . . Detective Matzke mentioned the bags. He mentioned the quantity of drugs, and he mentioned . . . cash, all signs of distribution. Ladies and gentlemen, this is possession of methamphetamine and Mr. Dalton had the intent to distribute the same. ¶ 102 Based on this evidence and the prosecutor’s argument, while the jury “might have inferred . . . that [he] possessed and [intended to] distribute[] different quanta of drugs,” Davis, ¶ 40, 352 P.3d at 958, it alternatively could have inferred a number of other reasons for the separate packaging. The drugs may have been separately packaged for easier distribution or because the amount of drugs would not fit in a particular size of bag. In arguing for Dalton’s conviction, the prosecutor did not provide any evidence or argument establishing that Dalton possessed a particular quantum of drugs that he did not also intend for distribution. In fact, the prosecutor 
49 argued that the evidence, specifically the cash found in Dalton’s possession at the hospital, pointed to Dalton being a distributor and not a simple possessor: “[Detective Matzke testified that] [t]he average user possesses two to four grams, a few days. They’re not going to have money because all they can think about is drugs.” ¶ 103 Moreover, it makes no difference that, as the People argue, the jury answered “yes” to a special interrogatory on the charge of possession with intent to manufacture or distribute. While a jury may find a defendant guilty of an offense and a lesser included offense, “the defendant may not be convicted of both.” Reyna-
Abarca, ¶ 51, 390 P.3d at 824. A special interrogatory regarding a specific offense does not strip Dalton of his constitutional double jeopardy protections. ¶ 104 For these reasons, we cannot conclude that “each legally distinct offense has been charged with sufficient specificity to distinguish it from other offenses . . . .” Abiodun, 111 P.3d at 471. Thus, we hold that, by convicting Dalton of both offenses, and sentencing him on both, the trial court obviously and substantially violated Dalton’s “right to avoid double jeopardy in a way that so undermined the fundamental fairness of the sentencing proceeding 
50 as to cast serious doubt on the reliability” of his sentence. Davis, ¶ 41, 352 P.3d at 958. For this reason, while we affirm Dalton’s judgment of conviction for possession with intent to manufacture or distribute, which is supported by the jury’s verdict, we reverse Dalton’s judgment of conviction for the lesser included offense — possession of a controlled substance. G. Cumulative Error ¶ 105 Because the trial court did not err, aside from not merging Dalton’s convictions for possession with intent to manufacture or distribute a controlled substance and simple possession, we reject his argument that his convictions should be set aside based on cumulative error. See People v. Thames, 2019 COA 124, ¶ 69, 467 P.3d 1181, 1194 (“[A] single error is insufficient to reverse under the cumulative error standard.”). III. Conclusion ¶ 106 Dalton’s judgment of conviction for possession with intent to manufacture or distribute a controlled substance is affirmed, but his conviction and sentence for simple possession of a controlled substance is vacated. The case is remanded to the trial court for 
51 resentencing based on his conviction for possession with intent to manufacture or distribute a controlled substance. JUDGE FURMAN and JUDGE BROWN concur.