22CA0754 Peo v Torreyson 03-05-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA0754
Garfield County District Court No. 18CR320
Honorable James B. Boyd, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Trevor David Torreyson,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE GROVE
Yun and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 5, 2026

Philip J. Weiser, Attorney General, Austin R. Johnston, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Casey J. Mulligan, Alternate Defense Counsel, Boulder, Colorado, for Defendant-Appellant

¶ 1     Defendant, Trevor David Torreyson, appeals his judgment of conviction entered upon a jury finding him guilty of first degree murder (after deliberation).  We affirm.

## I.     Background

¶ 2     Torreyson and Keith Wayne were both members of the Glenwood Springs homeless community.  Torreyson often made camp under Interstate Highway 70 near a Subaru dealership and a convenience store.

¶ 3     On the morning of June 20, 2018, police were called to investigate a dead body near the convenience store.  The deceased, later identified as Wayne, was found in some bushes near a picnic table, with blood covering his shirt and back.  Wayne's head and mouth showed evidence of severe trauma consistent with "numerous" blunt force blows.  An autopsy later revealed that his neck had been fractured in two places.  Police observed bloody footprints leading away from the scene and found a distinctive multicolored bandana underneath Wayne's body that they later identified as Torreyson's.

¶ 4     Investigating officers, familiar with where Torreyson often stayed, went to his campsite that night.  There, they found

Torreyson in bed in a bloody shirt, with what appeared to be dried blood on his arms and hands. Blood-covered hiking boots roughly matching the observed footprints and blood-soaked jeans were found nearby. Wayne's backpack was also at the campsite.

¶ 5    Forensic analysis later revealed that patterns of dried blood found on Torreyson's shirt, boots, and jeans were consistent with "impact splatter" resulting from blunt force trauma. Testing also showed that Torreyson and Wayne were very likely the sources of DNA found on Torreyson's shirt, bandana, underwear, jeans, and boots, as well as saliva found on the ground near Wayne's body. In addition, surveillance video taken during the evening of June 19, 2018, captured Torreyson and Wayne walking towards the picnic table near where Wayne's body was found the next morning.

¶ 6    Torreyson was charged with first degree murder (after deliberation). After being represented by several different attorneys, Torreyson chose to proceed pro se at trial. His theory of defense was that he did not kill Wayne; rather, an unknown suspect did. A jury found Torreyson guilty as charged, and the trial court sentenced him to life in prison without parole.

¶ 7    Torreyson now appeals, arguing that the trial court reversibly erred when it (1) admitted bad character evidence; (2) did not sua sponte correct alleged misstatements of the law and improper arguments by the prosecutor; and (3) failed to instruct the jury on voluntary intoxication as a defense. He also maintains that he was denied a fair trial due to the cumulative effect of these alleged errors. We address each argument in turn below.

## II.    Threat Evidence

¶ 8    Torreyson contends that the trial court reversibly erred by admitting testimony of a violent threat Torreyson made towards two other homeless individuals not connected to the crime in violation of CRE 404(b). We disagree.

### A.    Additional Facts

¶ 9    Russell Nelson, another member of the Glenwood Springs homeless community, testified at trial about his interactions with Torreyson during the evening of June 19, 2018. Nelson described sitting with others at picnic tables near the convenience store when

Torreyson approached and accused Nelson of taking his dry bag.[1] Nelson testified that he denied taking Torreyson's bag and told Torreyson that he had purchased the bag in his possession from Paul and Jamie, a couple in the homeless community.

¶ 10    Paul and Jamie then arrived at the picnic tables. Torreyson accused them of stealing his dry bag and selling it. The argument escalated, and Torreyson told the couple,

> I will find you, I will tie you up, I will rape you
> in every single hole, and then I will proceed to
> dismember you and spread you around.

¶ 11    Paul and Jamie left shortly after, and Wayne showed up ten to thirty minutes later. He approached Nelson, excited that he had just won fifty dollars from a scratch-off lottery ticket. Torreyson interrupted and told Wayne that Wayne owed him a bottle of liquor. Torreyson and Wayne then walked away. Nelson described Torreyson as "still upset" when he left.

¶ 12    Torreyson — who, again, represented himself at trial — did not contemporaneously object to any of Nelson's testimony. After

---

[1] According to Nelson, a dry bag is a waterproof bag commonly carried by those living outdoors to keep electronics and photos from being destroyed.

4

Nelson finished testifying, however, Torreyson raised the following objection:

> [W]hat the prosecution was mentioning this morning about alternate suspect and defense theory. They also haven't presented a specific theory on manner of death, motive of death, item of death, motive. Specifically, according to [CRE] 404(b), Russell Nelson's testimony about — about a side issue that was taking place, preexisting to the night of the incident, should be stricken from the record.

¶ 13    The prosecutor responded that he believed Torreyson was objecting to "the back-and-forth discussion" between Torreyson and the couple and suggested the court issue limiting instructions.

¶ 14    The court asked Torreyson to be more "specific about what [testimony] you think should be removed." Torreyson clarified that the "side issue" he was objecting to was "[t]he backpack." Torreyson reasoned that because Nelson had denied during cross-examination that Wayne had "anything to do with stealing any of [Torreyson's] stuff," "there would be no reason to further relate any other further testimony about . . . the stolen backpack."

¶ 15    The prosecutor responded by arguing that the contested evidence related to Torreyson's "state of mind." Citing *Rojas v. People*, 2022 CO 8 — which had been issued the day before

Torreyson's trial began and adopted a new framework for the admission of other acts evidence — the prosecutor argued that the evidence was "intrinsic to the elements of the offense in relation to the culpable mental state" and should be admitted on that basis.

¶ 16    Applying the *Rojas* framework in its ruling the following morning, the court determined that the contested testimony — "that [the couple] stole [Torreyson's] bag and then it ended up getting sold to [Nelson]," the discussion about the bag, the arrival of the couple, Torreyson's increased anger and attributed threat towards the couple, and then the arrival of Wayne — was extrinsic evidence and thus subject to CRE 404(b). The court acknowledged that the prosecution had not provided advance notice of its intent to introduce the evidence under CRE 404(b) but found good cause for that oversight based on *Rojas*'s recent abolition of the res gestae doctrine.

¶ 17    The court proceeded to consider the admissibility of the evidence under CRE 404(b) and *People v. Spoto*, 795 P.2d 1314, 1318-19 (Colo. 1990). It found that the evidence was relevant and admissible as to "motive . . . and/or intent," noting that Nelson's description of Torreyson's angry mental state was "independent of

just an inference of bad character." Under CRE 403, the court determined that the probative value of the testimony substantially outweighed the danger of unfair prejudice because the testimony recounted events immediately before Wayne's death. The court subsequently instructed the jurors that they could only consider the interaction between Torreyson and the couple for the purpose of evaluating intent and motive.

## B. Good Cause

¶ 18 We first reject Torreyson's argument that the trial court erred when it excused the prosecution's lack of pretrial notice of the contested evidence.

¶ 19 CRE 404(b)(3)(A) requires the prosecutor, before introducing evidence of other crimes, wrongs, or acts in a criminal case, to "provide reasonable notice of any such evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it." The notice must be in writing and articulate the reasoning and purpose for which the prosecutor intends to offer the evidence. CRE 404(b)(3)(B), (C). But a trial court may excuse a lack of notice for good cause shown. CRE 404(b)(3)(C).

7

¶ 20     Reviewing the court's evidentiary ruling for an abuse of discretion, *People v. Abad*, 2021 COA 6, ¶ 8, we perceive no error. The trial court based its finding of good cause on the supreme court's recent decision in *Rojas* — which, the day before trial began, abolished the doctrine of res gestae in criminal cases. Before *Rojas*, the evidence in question likely would have been admissible as res gestae and thus not subject to the pretrial notice requirements of CRE 404(b). *See Zapata v. People*, 2018 CO 82, ¶ 58 ("[R]es gestae evidence is linked in time and circumstances to the charged crime, it forms an integral and natural part of the crime, or it is necessary to complete the story of the crime for the jury.").

¶ 21     Given that the prosecution had, at best, a single day to provide pretrial notice of its intent to introduce the statements in question under CRE 404(b), the trial court did not abuse its discretion by finding good cause for the prosecution's noncompliance.

### C.     Admissibility Under CRE 404(b)

#### 1.     Applicable Law and Standard of Review

¶ 22     Under the *Rojas* framework, the applicability of CRE 404(b) to other acts evidence turns on whether the evidence is "intrinsic or extrinsic to the charged offense." *Rojas*, ¶ 52. "Intrinsic acts are

those (1) that directly prove the charged offense or (2) that occurred contemporaneously with the charged offense and facilitated the commission of it." *Id.* "Evidence of acts that are intrinsic to the charged offense are exempt from Rule 404(b) because they are not 'other' crimes, wrongs, or acts." *Id.*

¶ 23 Other acts evidence is admissible under *Spoto* and CRE 404(b) if (1) the evidence relates to a material fact; (2) the evidence is logically relevant; (3) the logical relevance is independent of the prohibited intermediate inference that the defendant was acting in conformity with his bad character; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Bondsteel v. People*, 2019 CO 26, ¶ 50.

¶ 24 We review a trial court's evidentiary rulings for an abuse of discretion. *Abad*, ¶ 8. A trial court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law. *Id.*

### 2. Analysis

¶ 25 Torreyson argues that the court should not have admitted Nelson's testimony about Torreyson's "horrific" threat "to tie up, rape, kill and dismember" the couple because it had no relevance

beyond its tendency to show that Torreyson had a "propensity to get angry and form an intent to kill."

¶ 26    We conclude that the evidence was properly admitted because, as the trial court found, it was relevant to Torreyson's state of mind prior to the killing as well as a potential motive. Nelson's testimony showed that Torreyson was angry immediately before meeting Wayne, that he turned that anger toward Wayne when he arrived, and that he was "still upset" when he left with Wayne.

¶ 27    This evidence was logically relevant because it tended to prove that Torreyson formed the mental state necessary for first degree murder. Its relevance was also independent of the prohibited inference that Torreyson committed the charged offense because he had a "propensity to get angry and form an intent to kill." *See People v. Snyder*, 874 P.2d 1076, 1080 (Colo. 1994) ("The third prong of the *Spoto* test does not demand the absence of the inference but merely requires that the proffered evidence be logically relevant independent of that inference."). The logical relevance was not that Torreyson had a propensity to get angry; it was that he was in fact angry around the time of the killing. And, given the incremental probative value of the threat — that is, "what

weight the evidence add[ed] to the prosecution's case," *People v. Shores*, 2016 COA 129, ¶ 44 — we agree with the trial court's balancing of the factors under CRE 403. Moreover, the court reduced the possibility of unfair prejudice by giving the jury a limiting instruction. *See People v. Vialpando*, 954 P.2d 617, 623 (Colo. App. 1997) (limiting instructions mitigate the danger of unfair prejudice).

¶ 28 Accordingly, because we agree with the trial court's application of the *Spoto* factors and CRE 404(b), we perceive no error in its admission of Nelson's testimony about the stolen backpack and the threats Torreyson made to Paul and Jamie.

## III. Prosecutorial Misconduct

¶ 29 Torreyson contends that the trial court reversibly erred when it allowed the prosecution to (1) misstate the mens rea for first degree murder by blurring the distinction between intentional and deliberative conduct, and (2) denigrate Torreyson during closing argument. We are not persuaded.

### A. Standard of Review

¶ 30 We engage in a two-step analysis when reviewing claims of prosecutorial misconduct, considering first whether the conduct

was improper based on the totality of the circumstances and then whether any misconduct warrants reversal. *People v. Van Meter*, 2018 COA 13, ¶ 23. We will only disturb a district court's determination of whether a prosecutor engaged in misconduct upon a showing of "a gross abuse of discretion resulting in prejudice and a denial of justice." *People v. Payne*, 2019 COA 167, ¶ 45 (quoting *People v. Krueger*, 2012 COA 80, ¶ 51).

¶ 31    When a defendant does not object to a prosecutor's statements, as here, we review alleged prosecutorial misconduct for plain error. *People v. Rhea*, 2014 COA 60, ¶ 43. Plain error is an obvious and substantial error, and we reverse such error when it "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Hagos v. People*, 2012 CO 63, ¶ 14 (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)). To rise to the level of plain error, the prosecutorial misconduct must be flagrant or glaringly or tremendously improper. *People v. Weinreich*, 98 P.3d 920, 924 (Colo. App. 2004), *aff'd,* 119 P.3d 1073 (Colo. 2005).

## B.     Intentional and Deliberate Conduct

¶ 32     Torreyson argues that the prosecutor misstated the law and misled the jury as to the elements of first degree murder by making improper analogies during voir dire and by "blurring the distinction" between "after deliberation" and "intentionality." He contends that the prosecutor's mischaracterization of the elements of the charged offense continued throughout trial, including during opening statements and closing arguments.

### 1.     Applicable Law

¶ 33     As relevant here, a person commits first degree murder if, "[a]fter deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person or of another person." § 18-3-102(1)(a), C.R.S. 2025. "'After deliberation' and 'intent' are two distinct elements, which together constitute the specific intent mental state of first-degree murder." *Miller*, 113 P.3d at 750 (citing § 18-3-102(1)(a)).

¶ 34     Here, the jury instructions described the "applicable states of mind" as follows.

> The term "after deliberation" means not only intentionally but also that the decision to commit the act has been made after the

exercise of reflection and judgment concerning the act. An act committed after deliberation is never one which has been committed in a hasty or impulsive manner.

A person acts "intentionally" or "with intent" when the person's "conscious objective is to cause the specific result proscribed by the statute defining the offense. It is immaterial whether or not the result actually occurred."

## 2. Additional Facts

¶ 35 During voir dire, the prosecutor asked jurors what they thought it looked like to act intentionally. He then began analogizing intentionality to speeding up to catch a yellow light at a traffic intersection:

> Prosecutor: [H]ave you ever been in a scenario where you were driving up to a red light or a green light, and it's going yellow, and you're like, "I can make it"?
>
> Prospective Juror: I speed up.

¶ 36 Then, the prosecution introduced a hypothetical where the driver is the second person to go through a red light:

> Prosecutor: Do you think that the decision to go through [a] red light was an intentional one?
>
> Prospective Juror: Absolutely.

¶ 37 Continuing the colloquy, the prosecutor asked:

> Prosecutor: [L]et me sort of switch it up here a little bit and think, are — as you're making that decision to go through the red light, are there things that you factor into — or — or is it —
>
> Prospective Juror: Oh, yeah.
>
> Prosecutor: — "hold on, baby, here we go," or are there things that you're doing?
>
> Prospective Juror: It's depending on how busy it is. I look — you know, I might have a moment where I think about where I am, how much of a hurry I'm in.

¶ 38    Shortly thereafter, the prosecutor turned to another juror, asking about how much "thought goes into that decision before you ultimately decide to gas or brake" at a yellow light. After the prospective juror described what factors would go into that decision, the prosecutor asked, "How much time does it take for you to do that process?" The juror responded, "[T]wo to three seconds."

¶ 39    During his opening statement, the prosecutor described the elements of first degree murder as follows: "[Torreyson], in the State of Colorado, on or about the place charged, on approximately June 18th . . . deliberately killed Keith Wayne."

¶ 40    Then, in closing argument, when suggesting that Torreyson might have bludgeoned Wayne with a rock, the prosecutor said,

"[Torreyson] decided to pick [the rock] up and bend over and hit Keith Wayne. Deliberation can take place in seconds. You may conclude that when [Torreyson] stooped to pick up the rock, he formed the requisite mental state of deliberation."

### 3. Analysis

¶ 41 Torreyson argues that the prosecutor's traffic-light analogy in voir dire misled the jury as to the meaning of "after deliberation." He further asserts that the prosecutor's misstatements continued throughout opening statements and closing arguments, and that he "sought to harvest the fruits of seeds planted during voir dire," *People v. McBride*, 228 P.3d 216, 224 (Colo. App. 2009), by repeatedly omitting the intentionality element and using the word "deliberately" instead of "after deliberation" to describe the required mental state for first degree murder.

¶ 42 In *McBride*, a division of this court held that the trial court committed plain error requiring reversal by allowing the prosecutor to make a yellow-light analogy during voir dire as a basis for suggesting that deliberation could occur "as 'fast' as '[a] second.'" *Id.* at 224-25. The division held that the prosecutor's position "contradicted Colorado law requiring that some 'appreciable length

of time must have elapsed to allow deliberation, reflection[,] and judgment," *id.* at 225 (quoting *Key v. People*, 715 P.2d 319, 322 (Colo. 1986)), and thereby "obliterat[ed] any distinction between intentional and deliberative acts," *id.*

¶ 43    While the prosecutor's decision to employ a traffic-light analogy was perhaps unwise, *see People v. Vialpando*, 2022 CO 28, ¶ 41, we conclude that the circumstances here are distinguishable from *McBride*. Although the prosecutor's colloquy — which began as a discussion of intentionality and then seemingly morphed into a discussion of deliberation — suggested that deliberation can occur in a short period of time, comments from several prospective jurors made it clear that they understood that an instantaneous decision is incompatible with a decision made after deliberation. Indeed, as the conversation drifted from intentionality towards deliberation, one juror pushed back on the prosecutor's line of questioning, explaining that "in the traffic-light scenario, sometimes . . . the decision has to come quick enough that there is not premeditation, making it instead 'a snap judgment.'" The juror explained that "in some scenarios you may not have the time needed to go through some sort of cognitive exercise" to make a logical, objective decision.

¶ 44    Other comments during voir dire support the conclusion that, even if the prosecutor blurred the line between intentional conduct and conduct occurring after deliberation, the jurors understood the difference between the two concepts. For example, responding to the traffic-light analogy, one juror said that the decision to speed up or slow down involves "a lot of decisions" and "planning." Another juror explained that the prosecutor's analogy was wholly inapt, pointing out that the time pressure associated with the decision to go through a traffic light just as it changes is precisely what prevents a driver from "hav[ing] the opportunity to take other factors into consideration and weigh them and make a decision." As the juror put it, "[I]n some scenarios you may not have the time needed to go through some sort of cognitive exercise to judge the situation objectively and make a decision that feels like it's logical or sensible."

¶ 45    Under these circumstances — where nothing in the record suggests that the prosecutor's inartful comments confused the prospective jurors — we cannot conclude that the trial court erred by failing to intervene sua sponte. Even if the prosecutor could have done a better job of distinguishing "between intentional and

deliberative acts," *McBride*, 228 P.3d at 225, his failure to do so does not convince us that the court plainly erred by declining to intervene.

¶ 46    Still, Torreyson argues that the voir dire discussion at least confused the distinction between intentional and deliberative acts, and that the prosecution further collapsed the two concepts during his opening statement and closing argument.  In particular, during his opening statement, the prosecutor told the jurors that "the elements of the crime of first degree murder" include a requirement that Torreyson "deliberately killed" Wayne.  And during closing argument, the prosecutor told the jurors that "[d]eliberation can take place in seconds."  While neither statement was entirely accurate, they did not amount to plain error.

¶ 47    To the extent that Torreyson argues that the prosecutor's statements were an attempt to build on the traffic-light analogy, the record does not reveal an obvious connection between those statements and the voir dire discussion.  Indeed, unlike the prosecutor in *McBride*, here, the prosecutor never mentioned the traffic-light analogy again after voir dire.  *See McBride*, 228 P.3d at 224-25.

¶ 48    The remaining challenged statements appear to be more inartful than an attempt to mislead the jurors or alter the prosecution's burden of proof. *See People v. Samson*, 2012 COA 167, ¶ 30 ("[B]ecause arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful."). For example, while the prosecutor did substitute "deliberately" for "after deliberation" at one point, he ended his rebuttal closing with an accurate statement of the law, asking the jury to consider whether "[Torreyson] act[ed] intentionally and after deliberation? . . . The question is, did he do [the alleged crime] intentionally, and did he do it after deliberation?" And, while the prosecutor's assertion that "deliberation can take place in seconds" came perilously close to the bright line drawn in *McBride*, any impropriety was tempered by the argument immediately following the statement, which focused on how many times Torreyson needed to hit Wayne with a rock for it to be considered intentional and pointed out that Torreyson would have had multiple opportunities during the lengthy attack to pause, reflect, and stop the attack, but he deliberately continued.

¶ 49    Moreover, the trial court repeatedly provided the jurors with accurate statements of the law.  It prefaced the voir dire discussion and the prosecution's opening statement by explaining that first degree murder required a defendant to act "after deliberation, and with the intent to cause the death of a person other than himself." Before closing arguments, the court told the jurors that they "must follow the instructions" it gave them and that their decision "must be made by applying the rules of law" it provided.  The court then defined and delineated the concepts of "after deliberation" and "intentionally" as elements of first degree murder verbally and in its written instructions to the jury.  *See People v. Carian*, 2017 COA 106, ¶ 45 ("Without contrary evidence, 'we presume that a jury follows a trial court's instructions.'" (citation omitted)).

¶ 50    Given the totality of the circumstances, we cannot conclude that the trial court obviously erred by failing to redirect the prosecution away from the traffic-light analogy or otherwise intervene when the prosecutor's statements blurred the line between intentional and deliberative conduct.  *See Van Meter*, ¶ 23; *People v. Sauser*, 2020 COA 174, ¶¶ 86-97 (holding that a prosecutor's use of a puzzle analogy to illustrate reasonable doubt

21

during voir dire and closing argument did not constitute plain error given the isolated usage and the trial court's correct verbal and written instructions); *People v. Carter*, 2015 COA 24M-2, ¶¶ 57-61.

### C. Denigrating Statements

¶ 51    Torreyson contends that the prosecutor made multiple demeaning comments during closing arguments that created animosity against him and thus deprived him of a fair trial. Torreyson argues that the prosecutor's comments calling his version of events "ludicrous," "absurd," "fantastical," and "offensive to common sense," among other things, along with his claim that Torreyson was "cowardly" for not asking certain questions of Nelson on cross-examination, amounts to plain error requiring reversal.

### 1. Additional Facts

¶ 52    During closing arguments, the prosecutor did the following.

- He reviewed the evidence and Torreyson's defense and told the jury that there were two plausible explanations for Wayne's murder: either Torreyson committed it or someone framed him. He then said that the "latter answer is ludicrous."

- He recounted the multiple inconsistent versions of Torreyson's story and remarked that his explanations were "absolutely nonsensical when you consider the overwhelming" forensics evidence on Torreyson's clothing.

- He asked the jurors if their "common sense" would allow them to accept Torreyson's "fantastical story" that "someone framed him by smearing and spattering Keith Wayne's blood" on his clothing while he was asleep.

- He compared the forensic evidence and blood spatter found on Torreyson's clothing to Torreyson's theory of defense and, again, called Torreyson's account "offensive to common sense" and designed "to throw [the jurors] the wildest pitch possible, hoping [they]'ll swing."

- He summarized Nelson's testimony and recounted that Torreyson told the jury that Nelson's account was incorrect on several issues. The prosecutor then pointed out that, instead of cross-examining Nelson about the inaccuracies, Torreyson "wait[ed] cowardly" for Nelson's

testimony to conclude before testifying himself and contradicting Nelson's alleged misrepresentations.

## 2.  Applicable Law

¶ 53    "[A] prosecutor, while free to strike hard blows, is not at liberty to strike foul ones." *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005) (quoting *Wilson v. People*, 743 P.2d 415, 418 (Colo. 1987)).  A prosecutor has wide latitude to make arguments based on the facts in evidence and reasonable inferences drawn from those facts.  *People v. Maloy*, 2020 COA 71, ¶ 61.  Still, a prosecutor's arguments must stay within ethical boundaries to ensure that closing arguments do not mislead or unduly influence the jury.  *Domingo-Gomez*, 125 P.3d at 1049.  Thus, as relevant here, a prosecutor may not denigrate the defense, *People v. Welsh*, 176 P.3d 781, 788 (Colo. App. 2007), or make arguments calculated to inflame the jury's passions or prejudice, *People v. Dunlap*, 975 P.2d 723, 758 (Colo. 1999).  In determining whether a closing argument was improper, we may consider the language used, the context of the statements, the strength of the evidence, and whether the prosecutor repeated the misconduct.  *People v. Lovato*, 2014 COA 113, ¶ 64.

### 3. Analysis

¶ 54 The prosecutor's statements that Torreyson's version of events was "ludicrous," "absurd," "fantastical," "offensive to common sense," and trying to "throw [the jurors] the wildest pitch possible, hoping [they]'ll swing," do not require reversal. *People v. Allee*, 77 P.3d 831, 837 (Colo. App. 2003) (a prosecutor may employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance, so long as he or she does not thereby induce the jury to determine guilt based on passion or prejudice, attempt to inject irrelevant issues into the case, or accomplish some other improper purpose). Each of these statements characterized the evidence or otherwise responded directly to Torreyson's theory of defense. *See People v. Perea,* 126 P.3d 241, 247 (Colo. App. 2005) (explaining that during closing remarks, prosecutors have wide latitude in the language and style they choose to employ, especially in responding to an argument by the defense); *People v. Estes*, 2012 COA 41, ¶ 28 (a prosecutor may comment on the strength of the defense's theories and, in doing so, does not shift the burden to the defense).

¶ 55    The prosecutor's comment that Torreyson "wait[ed] cowardly" to contradict Nelson's testimony is more troubling because prosecutors should avoid pejoratives and name calling. *McBride*, 228 P.3d at 222-23. Depending on the context, calling a defendant a "coward" is not "always error, much less obvious error." *Id.* at 222. But it is improper if it serves only to erroneously divert jurors' attention from factual issues concerning the defendant's guilt or innocence. *Id.*; *see People v. Jones*, 832 P.2d 1036, 1039 (Colo. App. 1991).

¶ 56    Here, the prosecutor's comment served both a proper and improper purpose. On one hand, it suggested to the jurors that it would have been more effective for Torreyson to cross-examine Nelson about his allegedly false statements than it was for him to simply contradict them when he testified on his own behalf. *Cf. Samson*, ¶ 31 (noting that a prosecutor may "comment on the absence of evidence to support a defendant's contentions"). On the other hand, the prosecutor's choice of words — particularly in a case involving a self-represented defendant — implied that Torreyson had "a bad character" and thereby improperly shifted the

focus of the jury's attention from the evidence in the case. *People v. Serra*, 2015 COA 130, ¶ 88.

¶ 57　Given the remark's dual implication and fleeting nature, and considering it in the context of the prosecutor's closing argument as a whole, we cannot conclude that it so undermines the fundamental fairness of the trial as to cast serious doubt upon the reliability of the judgment of conviction. *Hagos*, ¶ 14; *see People v. McMinn*, 2013 COA 94, ¶ 70 (no plain error when improper comments "made up a small part of the prosecutor's closing argument, during which he generally and fairly summarized the evidence and provided reasons, based on the evidence," to convict the defendant).

## IV.　Voluntary Intoxication

¶ 58　Torreyson maintains the trial court should have sua sponte instructed the jury on a voluntary intoxication defense given the evidence at trial, and that its failure to do so constituted reversible error. We disagree.

### A.　Applicable Law and Standard of Review

¶ 59　Voluntary intoxication is not a defense against a criminal charge. § 18-1-804(1), C.R.S. 2025. However, evidence of intoxication may be offered by a defendant to negate the specific

intent necessary for certain offenses, including first degree murder after deliberation. *Id.*; *Brown v. People*, 239 P.3d 764, 769 (Colo. 2010).

¶ 60  We review de novo whether the trial court correctly instructed the jury regarding the law applicable to the case. *Hoggard v. People*, 2020 CO 54, ¶ 12. However, because Torreyson did not object to the jury instructions given at trial or request the voluntary intoxication instruction that he now argues should have been included, our review is limited to whether the omitted instruction constituted plain error. *Espinoza v. People*, 712 P.2d 476, 478 (Colo. 1985).

¶ 61  Plain error is obvious and substantial, and we reverse only if the error "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Hagos*, ¶ 14 (citation omitted). The defendant has the burden of establishing plain error. *People v. Boykins*, 140 P.3d 87, 95 (Colo. App. 2005); *People v. Cowden*, 735 P.2d 199, 202 (Colo. 1987) ("Failure to instruct properly on an element of a crime does not constitute plain error where that element is not contested at trial, or where evidence of the defendant's guilt is overwhelming.").

## B.    Analysis

¶ 62    Torreyson relies heavily on *Martinez v. People*, 470 P.2d 26, 28 (Colo. 1970), for the proposition that the trial court should have sua sponte instructed the jury on voluntary intoxication.  In *Martinez,* the supreme court held that the trial court erred by failing to "instruct[] the jury on the matter of voluntary drunkenness" in a case where a self-represented defendant who was charged with a specific intent offense did not request such an instruction and "clearly . . . did not know what it was."  *Id.*

¶ 63    The circumstances here are distinguishable from those in *Martinez.*  For one thing, in contrast to *Martinez,* nothing in the record suggests that Torreyson was wholly incapable of mounting a defense at trial.  *See id.* (holding that it was incumbent upon the trial court to instruct the jury on involuntary intoxication once "it became apparent that defendant was not competent to defend himself").  The defendant in *Martinez* proceeded pro se during trial and also rejected advisory counsel.  *Id.*  And while the opinion does not provide specific examples, the supreme court described him as "so inept" that the trial "resulted in a lack of due process."  *Id.* at 29.

¶ 64     Torreyson, in contrast, benefited from two public defenders acting as advisory counsel.  With their assistance and on his own accord, he submitted numerous pretrial motions, including motions to include specific jury instructions, to hire an investigator, to hire a paralegal to catalog discovery, to provide notice of his "general denial" defense, and to submit a witness list.  Torreyson meaningfully participated in voir dire, cross-examined more than twenty witnesses, and directly examined six witnesses, including himself, at trial.  During one of his direct examinations, Torreyson questioned a police officer present during the collection of crime scene evidence about his collection methods and published exhibits to the jury.  Torreyson made multiple, at times successful, objections during trial, including objections regarding hearsay and character evidence, challenged the credentials and qualifications of expert witnesses, and challenged the relevance of photographic evidence to his theory of defense.  In light of this record, we would not describe Torreyson as inept.

¶ 65     But even if we were to assume for the sake of argument that the trial court erred, reversal would not be required.[2]  The lack of voluntary intoxication instruction does not cast serious doubt on the reliability of the judgment of conviction.  *Hagos*, ¶ 14.  There was certainly evidence presented at trial suggesting that Torreyson had been drinking in the hours before the murder took place.  But the jury was instructed on the lesser included offenses of second degree murder and manslaughter, which require a mens rea of "knowing" and "reckless," respectively.  *Brown*, 239 P.3d at 769 ("[A] voluntary intoxication instruction . . . , while legally distinct from a lesser included offense instruction, serves substantially the same purpose under the law and facts of this case."); *see also Thornburg v. Mullin*, 422 F.3d 1113, 1126 (10th Cir. 2005) (explaining that the trial court's failure to sua sponte instruct the jury on voluntary intoxication did not deny the defendant a fundamentally fair trial

---

[2] The parties agree that Torreyson was present when his initial counsel argued that "voluntary intoxication is relevant" to the mens rea elements of first degree murder for the purposes of probable cause to charge him with first degree murder.  However, because Torreyson later changed counsel and there is no record of him affirmatively acknowledging his understanding, we, given his pro se status, cannot conclude that he waived this issue.  *See People v. Rediger*, 2018 CO 32, ¶ 12.

because the jury was alerted it could only convict the defendant if it found the prosecution had proved all the elements of first degree murder beyond a reasonable doubt, including the specific intent element).  In view of the lesser included instructions, the manner of the murder, and the overwhelming forensic evidence presented at trial, the record does not reveal a reasonable possibility that the lack of an instruction on voluntary intoxication contributed to the conviction.  *See Espinoza*, 712 P.2d at 478-79; *People v. Rubanowitz*, 688 P.2d 231, 240 (Colo. 1984).

## V.    Cumulative Error

¶ 66    Finally, Torreyson contends that the cumulative effect of the alleged errors deprived him of a fair trial and therefore requires reversal.  We disagree.

¶ 67    "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not."  *Howard-Walker v. People*, 2019 CO 69, ¶ 25.  When we review for cumulative error, "the ultimate question is whether the errors deprived the defendant of a fair trial."  *People v. Vialpando*, 2020 COA 42, ¶ 67 (citing *Howard-Walker*, ¶ 40), *rev'd on other grounds*,

2022 CO 28; *see also Howard-Walker*, ¶ 25 ("Stated simply, cumulative error involves cumulative prejudice.").

¶ 68     Although we conclude that the prosecutor made an improper comment about Torreyson's "cowardly" decision not to cross-examine Nelson, "a single error is insufficient to reverse under the cumulative error standard." *People v. Thames*, 2019 COA 124, ¶ 69.

## VI.   Disposition

¶ 69     We affirm the judgment of conviction.

JUDGE YUN and JUDGE SCHOCK concur.